[No. A121545. First Dist., Div. One. Jan. 8, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JERMAINE MERRELL HOLLIE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, IV, and V of the Discussion.

## Counsel

Andrew Parnes for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gerald A. Engler, Assistant Attorney General, Gregg E. Zywicke and Sara Turner, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**DONDERO, J.**—Defendant was convicted following a jury trial of rape (Pen. Code, § 261, subd. (a)(2)), and sexual penetration with a foreign object (Pen. Code, § 289, subd. (a)(1)), and sentenced to a term of 10 years in state prison.[1] In this appeal he argues that the statute of limitations for the offenses lapsed before the prosecution was commenced. He also challenges evidentiary rulings by the trial court: the admission of evidence of the uncharged sex offense; the exclusion of defense impeachment evidence; and the admission of evidence of his involuntary statement made to the police. Finally, he claims that prosecutorial misconduct was committed. We conclude that the 10-year statute of limitations did not expire, the trial court's evidentiary rulings were not erroneous, and no prejudicial prosecutorial misconduct was committed. We therefore affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## STATEMENT OF FACTS

*The Charged Offenses.*

Athena,[2] the victim of the charged sex offenses, testified that after drinking "about a six pack" on the evening of September 20, 1996, she had an argument with her husband and left their apartment in Daly City. She was barefoot and carrying a kitten her husband had thrown out of the apartment.

Athena was attempting to make her way to a friend's house when a "Black man" she positively identified at trial as defendant approached her in a car and asked if she needed a ride. Athena "got in the car," with the kitten on her lap in the front passenger seat. She asked defendant to give her a ride to her friend's house in South San Francisco, and he agreed. As they drove, the two engaged in conversation about the "issues" Athena had with her "husband and his drinking and his abuse." Defendant seemed friendly to Athena; she had no "suspicions or concerns" about him.

While they were in a residential area in Daly City defendant opened the door and Athena's kitten escaped from the car and ran up a hill. Athena got out of the car and followed the kitten, as did defendant. While they were on the hill pursuing the kitten defendant grabbed Athena on the wrist and attempted to pull her towards him. She screamed loudly and yelled, "What are you doing?" Defendant seemed shocked, and released Athena. He profusely apologized and said "he wouldn't try it again." He also helped Athena find the kitten, after which they returned to the car.

Defendant suggested that they get a beer before he drove Athena to her friend's house, and she reluctantly agreed. They stopped at a 7-Eleven store, where defendant purchased some beer. He then drove back to where they had parked before, and they drank beer, smoked some marijuana defendant provided, and talked. The "vehicle door was opened" and Athena's kitten "got loose again."

Athena left the car to retrieve her kitten and go to the bathroom in the trees. After she finished, defendant "rushed" up to her and pushed her to the ground, on her back. Defendant put his left hand on her mouth and used his right hand to unbutton her pants. Athena testified that she was "crying hysterically" and trying to push defendant away from her, so he pressed his

---

[2] For the sake of confidentiality, we will refer to the victims of the charged and uncharged sex offenses by their first names only, as the parties have done.

hand down so hard on her mouth that he cut her lip and she could "barely breathe." Defendant pulled off her shorts and underwear. Athena was still "struggling to breathe" as she felt defendant touch her vagina with "his fingers or his penis." She testified that she is not certain if defendant "was able to fully penetrate" her with his penis.

When another car "rolled up" to the wooded area defendant "just got up and left." Athena retrieved her shorts but could not find her underwear. She then jumped over a fence into someone's backyard. An occupant of the house thought she "was a burglar" and called the police.

Daly City Police Officer Joseph Collins responded to the report of a prowler at 110—3rd Avenue. He opened the rear sliding door of the residence and discovered Athena standing outside. She had a cut on her lip, and scratches on her knees and feet. She was also inebriated, "in shock and distraught." Athena told Officer Collins that she "had been raped." Athena gave the officer a brief description of the man who raped her: a "Black male about six foot one," wearing white tennis shoes, driving a dark four-door car. No one was found in the area who matched the description.

Athena was taken to the Daly City police station where she was interviewed by Officer Collins. She was still "very upset," "intoxicated," and crying during the interview. Athena stated that she was at home when her husband threw the kitten out of the house and told her, "You can't come back with the cat." She left the house and was walking on Mission Street when a "car pulled up next to her" and a "Black male" offered her a ride. Defendant drove her to an area in Daly City with a hill and some bleachers, where he grabbed her and pulled her pants down. Athena screamed "and he stopped." They "drove to another location" and "got out of the car again." As they were "walking in a field" defendant "grabbed her, threw her on the ground and pulled her pants off and her panties and raped her."[3] Athena admitted she was "playing with fire" when she "got into the car with the guy." She told the officer "it was her fault." She also told Officer Collins that the "Black male" gave her the name "Michael."

At the conclusion of the interview Athena was taken to the hospital for a sexual assault examination. Officer Collins later booked the medical kit given him by the hospital into evidence at the police station. After Athena's physical examination Officer Collins drove her home. Athena told her husband "what happened" to her.

---

[3] The recorded interview was played for the jury at trial.

The next day Athena directed Officer Collins to the field next to the house where she was found in the backyard the night before. During a search of the area Athena recovered her underwear. A second interview was also conducted at the police station. Athena gave a statement that was consistent with "what she said" the night before, but added "more details" about the assault.

The results of the sexual assault examination indicated that Athena suffered scratches on her back, upper chest, above the knees, upper left thigh, left buttock, and on both feet. She also had a laceration and swelling on her upper lip. No trauma to the vagina was observed, which is "not unusual" in forcible rape cases. Vaginal swabs were taken from the victim and sent to the crime lab.

The case investigation proceeded but eventually fell into "suspended status" due to lack of identification evidence. Not until October of 2001 were DNA profiles created for Athena and the samples obtained from the vaginal swabs. In March of 2005, a detective with the sexual assault unit of the Daly City Police Department received a communication from the Sacramento County Sheriff's Department that defendant may be a suspect in connection with the rape of Athena. Defendant was interviewed, and a DNA sample was obtained from him. In the interview, defendant denied any knowledge of Athena or contact with her. A subsequent comparison of DNA profiles taken from defendant and the vaginal swab indicated an exact match. Expert opinion testimony was offered that with "the highest degree of medical certainty" defendant "is the source of the semen from the vaginal swab."

*The Uncharged Offenses.*

The prosecution also offered evidence that defendant committed an uncharged sexual assault. The victim of the uncharged acts was Sarah, who was 15 years old in September of 1998, when she was approached by two African-American men in a light-colored SUV while she was walking on Arden Way in Sacramento. After she repeatedly declined offers of a ride from the men, the passenger left the vehicle and grabbed her by the arm. The man declared that she was "getting in here," and shoved her into the backseat. Sarah testified that the man who forced her into the SUV had "two silver front teeth," and identified him at trial as defendant.[4]

Sarah was driven to a duplex a few minutes away. She was then taken by defendant into a bedroom in the residence while the driver remained in the

---

[4] Sarah made an unequivocal identification of defendant, and when further questioned by the court said he "looks very like the person that did it." Defendant has two gold caps on his teeth.

vehicle and drove away. Defendant ordered Sarah to lie on the bed while he "started taking his clothes off." Sarah tried to leave, but defendant grabbed her by the arm as she walked down the hallway, then pulled her back into the bedroom and pushed her onto the bed. She was frightened, crying, and "saying 'No,' " but did not further attempt to physically resist defendant as he removed her clothes. Defendant put on a condom, forced his fingers in her vagina, then "started penetrating" her with his penis. After 10 or 15 minutes defendant told Sarah to put her "clothes back on." Defendant gave Sarah his pager number, and asked her to meet him later that night at Jack in the Box. He also told her his name was "Andre." The SUV later returned to the duplex and Sarah was taken to an ice cream store near her house; from there she "ran home." Sarah told her roommates she had been raped, and "they called the cops."

When a police officer arrived Sarah gave him a description of the incident and was then taken to a hospital for a sexual assault examination. The report of the examination specified "no physical findings and the exam was consistent with the history" provided by the victim. The parties stipulated that semen found on the underwear worn by Sarah at the time of the assault was "conclusively determined through DNA profile and comparison" to belong to defendant; examination of the vaginal swabs taken during the sexual assault examination "did not reveal the presence of any DNA belonging to the defendant."

## DISCUSSION

### I. *The Statute of Limitations Defense.*

We first confront defendant's claim that the statute of limitations lapsed before the present action was initiated with the filing of the indictment on February 15, 2006. Defendant demurred to the pleading and moved to dismiss the indictment (§ 995) in the trial court on the ground that the action was barred by the expiration of the six-year statute of limitations for an offense punishable by imprisonment in the state prison for eight years or more (§ 800).[5] The trial court accepted the prosecution's argument that the statute of limitations was tolled in the present case by section 803, subdivision (g), which specifies that, "Notwithstanding any other limitation of time described in this chapter, *a criminal complaint* may be filed within one year

---

[5] Section 800 reads: "Except as provided in Section 799, prosecution for an offense punishable by imprisonment in the state prison for eight years or more shall be commenced within six years after commission of the offense." The charged offenses were committed on September 20, 1996.

of the date on which the identity of the suspect is conclusively established by DNA testing . . . ," if the crime is "one that is described in subdivision (c) of Section 290" and the DNA analysis occurred no later than January 1, 2004. (Italics added.) The jury also found that the case against defendant had been filed within the period of limitations, as tolled by section 803, subdivision (g). Defendant claims that according to the plain language of the statute, section 803, subdivision (g), applies only if a prosecution is initiated by a *complaint* filed after a preliminary hearing, whereas the present case was initiated by an *indictment*. He therefore argues that the six-year statute of limitations was not tolled by the discovery of DNA evidence and expired long before the proceedings began in February of 2006.

For the first time on appeal the Attorney General presents the contention that the case is governed by the 10-year statute of limitations specified in section 801.1, subdivision (b), rather than the six-year statute of limitations stated in section 800. Section 801.1, subdivision (b), provides: "Notwithstanding any other limitation of time described in this chapter, if subdivision (a) does not apply, prosecution for a felony offense described in subdivision (c) of Section 290 shall be commenced within 10 years after commission of the offense." The Attorney General points out that defendant was charged with and convicted of offenses listed in section 290, subdivision (c), so the specific 10-year limitation applies, and the action was timely filed—that is, before September 20, 2006. Defendant replies that the prosecution "relied solely on section 803(g)(1)" at trial both in the charging document and presentation of the statute of limitations issue to the jury, and cannot seek to change the theory of the case on appeal.

██ We find that the Attorney General is not precluded from relying on section 801.1, subdivision (b), on appeal to support the finding in the trial court that the statute of limitations did not run, although the court did not base its ruling on the 10-year statute of limitations theory at trial. (See *People v. Smithey* (1999) 20 Cal.4th 936, 972 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].) The issue of expiration of the statute of limitations is not forfeited by lack of an objection in the trial court, and may be raised at any stage of the proceedings, even for the first time on appeal. (*People v. Williams* (1999) 21 Cal.4th 335, 341 [87 Cal.Rptr.2d 412, 981 P.2d 42]; *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1288 [53 Cal.Rptr.3d 473]; *People v. Le* (2000) 82 Cal.App.4th 1352, 1361–1362 [98 Cal.Rptr.2d 874].)[6] When a

---

[6] "In California the statute of limitations constitutes a substantive right. [Citation.] The prosecution bears the burden of pleading and proving the charged offense was committed within the applicable period of limitations. [Citation.] Where the pleadings do not show as a

charging document "indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time. If the court cannot determine from the available record whether the action is barred, it should hold a hearing or, if it is an appellate court, it should remand for a hearing." (*People v. Williams, supra*, at p. 341; see also *People v. Terry* (2005) 127 Cal.App.4th 750, 774 [26 Cal.Rptr.3d 71].) Where, as here, the evidence is not in dispute and we need not make any factual determinations on the record before us, we may independently resolve the statute of limitations issue on appeal. (*In re White* (2008) 163 Cal.App.4th 1576, 1582–1583 [79 Cal.Rptr.3d 195]; *People v. Price* (2007) 155 Cal.App.4th 987, 998 [66 Cal.Rptr.3d 595].) "[W]hen the trial court determines that certain counts are not time-barred, defendant's convictions as to those charged offenses will stand if the reviewing court can determine from the available record, including both the trial record and the preliminary hearing transcript, that the action is not time-barred despite the prosecution's error in filing an information in which those counts appeared to be time-barred." (*People v. Smith* (2002) 98 Cal.App.4th 1182, 1189 [120 Cal.Rptr.2d 185].)

■ Nor do we find any due process impediment to consideration of the 10-year statute of limitations issue on appeal. "Due process requires that a criminal defendant be given fair notice of the charges to provide an opportunity to prepare a defense and to avoid unfair surprise at trial." (*People v. Tardy* (2003) 112 Cal.App.4th 783, 786 [6 Cal.Rptr.3d 24].) Defendant had notice of the statute of limitations issue in the trial court and the issue was thoroughly litigated. The record before us permits review and resolution of the issue as a matter of law based on undisputed facts. (*In re White, supra*, 163 Cal.App.4th 1576, 1582–1583.)

That the trial court relied upon another statutory basis to find no lapse of the statute of limitations—that is, the tolling provision of section 803, subdivision (g)—is of no consequence to our consideration of the Attorney General's claim that the applicable 10-year statute of limitations did not run. "[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm. ' " 'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason. If right upon any theory of law applicable to the case, it must be sustained

matter of law the prosecution is time-barred, the statute of limitations becomes an issue for the jury (trier of fact) if disputed by the defendant." (*People v. Linder* (2006) 139 Cal.App.4th 75, 84 [42 Cal.Rptr.3d 496].)

regardless of the considerations which may have moved the trial court to its conclusion.' " ' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 582 [61 Cal.Rptr.3d 580, 161 P.3d 104]; see also *People v. Smith* (2005) 135 Cal.App.4th 914, 923 [38 Cal.Rptr.3d 1].) We proceed to determine if the 10-year statute of limitations of section 801.1, subdivision (b), applies in this case; if so, the prosecution was not time-barred.

On the date of the commission of the offenses, pursuant to section 800 the period of limitations then in effect was "six years after commission of the offense." (Added by Stats. 1984, ch. 1270, § 2, p. 4335.) Subsequently, however, a series of statutory amendments beginning in 2001 extended the period of limitations from six to 10 years for the offenses of which defendant was convicted. (See *In re White, supra*, 163 Cal.App.4th 1576, 1580.) Ultimately, section 801.1 was enacted, as effective January 1, 2005, which continued to provide for a 10-year time limit for prosecution of felony offenses described in subparagraph (A) of paragraph (2) of subdivision (a) of former section 290. (See also *In re White, supra*, at pp. 1580–1581.)[7] Concurrently, section 803.6 was added in 2004, which states: "(a) If more than one time period described in this chapter applies, the time for commencing an action shall be governed by that period that expires the latest in time. [¶] (b) Any change in the time period for the commencement of prosecution described in this chapter applies to any crime if prosecution for the crime was not barred on the effective date of the change by the statute of limitations in effect immediately prior to the effective date of the change. [¶] (c) This section is declaratory of existing law." (Added by Stats. 2004, ch. 368, § 3.)

■ Although the six-year period of limitations was applicable when the offenses were committed, the extension of the limitations period to 10 years governs the present case without violation of the prohibition against ex post facto laws. "The critical question for purposes of ex post facto analysis" is whether the provisions of the 10-year statute of limitations "became effective as to the charged offenses before expiration of the standard limitations period." (*People v. Terry, supra*, 127 Cal.App.4th 750, 775.) While a "law enacted after expiration of a previously applicable limitations period violates the *Ex Post Facto* Clause when it is applied to revive a previously time-barred prosecution," " 'where a right to acquittal has not been absolutely acquired by the completion of the period of limitation, that period is subject to enlargement or repeal without being obnoxious to the constitutional

---

[7] Section 801.1 was then amended in 2005, without substantive changes. (See Stats. 2005, ch. 479, § 2.) The most recent statutory amendment to section 801.1 became effective on October 13, 2007, again without substantive changes to the 10-year period of limitations. (Stats. 2007, ch. 579, § 40.)

prohibition against *ex post facto* laws.' " (*Stogner v. California* (2003) 539 U.S. 607, 632–633, 618–619 [156 L.Ed.2d 544, 123 S.Ct. 2446]; see also *People v. Superior Court (German)* (2004) 116 Cal.App.4th 1192, 1196 [10 Cal.Rptr.3d 893].) As a result of the sequence of revisions in the law, the six-year statute of limitations in section 800 had not expired when the 10-year statute of limitations became effective January 1, 2001, and was continuously in effect thereafter. (*In re White, supra,* 163 Cal.App.4th 1576, 1583.) Thus, the prosecution of defendant for the offenses listed in section 290 "was never time-barred, so constitutional ex post facto clause protection against prosecution with a statute of limitations enacted *after* a previous statute of limitations period expired is inapplicable. [Citations.] Here, the Legislature did not revive an expired statute of limitations period but simply extended one *before* expiration. That is constitutionally permissible." (*White, supra,* at p. 1583.) We therefore conclude that the 10-year statute of limitations for the offenses of rape and sexual penetration with a foreign object did not expire, and the prosecution of defendant was timely.[8]

## II. *The Admission of Evidence of the Uncharged Offenses.*

We proceed to defendant's claims that the trial court committed errors in its evidentiary rulings, the first of which is that the evidence of the uncharged offenses committed against Sarah was improperly admitted. He complains that the court "failed to properly weigh" the probative value of the evidence "against the probability that its admission would create substantial danger of undue prejudice" to him under Evidence Code section 352. He further maintains that due to the "dissimilarities between the two offenses" the probative value of the uncharged acts evidence "was substantially outweighed" by the risk of "undue prejudice." Defendant therefore contends that the admission of the evidence "was an abuse of discretion that resulted in a fundamentally unfair trial."

■ Despite the general prohibition against admission of uncharged criminal acts to prove disposition to commit charged crimes (Evid. Code, § 1101, subd. (a)), the evidence of the uncharged sexual assault on Sarah "was properly admitted under Evidence Code section 1108." (*People v. Frazier* (2001) 89 Cal.App.4th 30, 39 [107 Cal.Rptr.2d 100]; see also *People v. Branch* (2001) 91 Cal.App.4th 274, 280 [109 Cal.Rptr.2d 870]; *People v. McFarland* (2000) 78 Cal.App.4th 489, 494 [92 Cal.Rptr.2d 884].) "Evidence Code section 1108 authorizes the admission of evidence of a prior sexual offense to establish the defendant's propensity to commit a sexual offense, subject to exclusion under Evidence Code section 352." (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286 [96 Cal.Rptr.3d 512, 210 P.3d 1119]; see also

---

[8] In light of our conclusion we need not determine if the period of limitations was tolled pursuant to section 803, subdivision (g).

*People v. Walker* (2006) 139 Cal.App.4th 782, 796–797 [43 Cal.Rptr.3d 257].) "By removing the restriction on character evidence in section 1101, section 1108 now 'permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose*' [citation], subject only to the prejudicial effect versus probative value weighing process required by section 352." (*People v. Britt* (2002) 104 Cal.App.4th 500, 505 [128 Cal.Rptr.2d 290].)

We turn the focus of our inquiry to whether the evidence still was subject to exclusion under Evidence Code section 352, as defendant claims. To be admissible under Evidence Code section 1108, "the probative value of the evidence of uncharged crimes 'must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.]" (*People v. Walker, supra,* 139 Cal.App.4th 782, 796.) "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211 [105 Cal.Rptr.2d 187].) "The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314 [97 Cal.Rptr.2d 727].)

We will only disturb the trial court's exercise of discretion under Evidence Code section 352 "when the prejudicial effect of the evidence clearly outweighed its probative value." (*People v. Brown* (1993) 17 Cal.App.4th 1389, 1396 [22 Cal.Rptr.2d 14].) A trial court abuses its discretion when its ruling "falls outside the bounds of reason." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

■ We first reject defendant's claim that the trial court failed to undertake the requisite balancing of probative value and prejudice associated with admission of the evidence. "The record of a ruling based on Evidence Code section 352 ' "must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . ." [Citations.]' [Citation.]" (*People v.*

*Zapien, supra*, 4 Cal.4th 929, 960; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1170 [32 Cal.Rptr.3d 759, 117 P.3d 476]; *People v. Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468], overruled on another ground in *People v. Guiton* (1993) 4 Cal.4th 1116, 1128–1129 [17 Cal.Rptr.2d 365, 847 P.2d 45].) "[A]lthough the record must affirmatively show that the trial court weighed prejudice against probative value in admitting evidence of prior bad acts [citations], the trial judge 'need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation].' [Citations.] Thus, as the cases reflect, we are willing to infer an implicit weighing by the trial court on the basis of record indications well short of an express statement." (*People v. Padilla* (1995) 11 Cal.4th 891, 924 [47 Cal.Rptr.2d 426, 906 P.2d 388].) "[T]he necessary showing can be inferred from the record despite the absence of an express statement by the trial court." (*People v. Prince* (2007) 40 Cal.4th 1179, 1237 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) But without an express statement by the trial court that it has weighed prejudice against probative value, the record must at least "affirmatively demonstrate that the court did so." (*People v. Corella* (2004) 122 Cal.App.4th 461, 471 [18 Cal.Rptr.3d 770].)

We find in the present record ample indication that the trial court engaged in the requisite Evidence Code section 352 analysis. First, defendant made a specific section 352 objection to the uncharged acts evidence, both in his written opposition and at the hearing. The court expressly responded to the section 352 objection and devoted careful consideration and discretion to the issue of "prejudice versus probative value" of the evidence. (See *People v. Prince, supra*, 40 Cal.4th 1179, 1237; *People v. Zapien, supra*, 4 Cal.4th 929, 960; *People v. Triplett* (1993) 16 Cal.App.4th 624, 628–629 [20 Cal.Rptr.2d 225].) Thus, the record is more than adequate for us to undertake a meaningful appellate review of the trial court's decision. (*People v. Clair* (1992) 2 Cal.4th 629, 660–661 [7 Cal.Rptr.2d 564, 828 P.2d 705].) "The record reflects that the court performed its duty to balance the probative value of this evidence against its prejudicial effect." (*People v. Lewis, supra*, 46 Cal.4th 1255, 1285; see *People v. Crittenden* (1994) 9 Cal.4th 83, 135–136 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

We find that the sexual assault of Sarah was quite probative evidence in the present case. The crucial issue at trial was whether the sex acts with Athena were consensual. The resolution of the consent issue was primarily dependent upon the jury's assessment of the credibility of the victim. The defense admitted that "they had sex," but forcefully attacked Athena's credibility and claimed that the sex acts were "all consensual." The defense case not only challenged the accuracy of the victim's perception or recollection of events, but also asserted that her version of the incident was entirely concocted to avoid the shame and embarrassment of "having unprotected consensual sex" with a stranger. Evidence of the uncharged sexual assault committed by

defendant was vital to the jury's effort to evaluate the credibility of the victim and determine if her account of a forcible sexual assault was accurate. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 912 [89 Cal.Rptr.2d 847, 986 P.2d 182]; *People v. Walker, supra,* 139 Cal.App.4th 782, 797.)

We agree with defendant that the two incidents were dissimilar in some respects: Athena voluntarily entered defendant's vehicle, while Sarah was forcibly grabbed from the street by defendant while another man drove the vehicle; Athena stayed with defendant for eight to nine hours, whereas Sarah testified that she was directly taken to the residence, then promptly released after the sex acts occurred. Significantly, defendant declines to assess in his brief the many similarities shared by the offenses, however. Both victims were very young women—one 18, the other 15—who were fortuitously contacted by defendant in a vehicle while they were alone on the street. They both attempted to resist—Athena by pushing defendant away, Sarah by running out of the bedroom—but were physically restrained by defendant. They were both thrown on their backs and penetrated with defendant's fingers and his penis. Defendant gave false names to both of the victims after the sexual acts. The victims also gave similar descriptions of the perpetrator. The source of the uncharged acts evidence was also entirely unrelated to the charged offenses, which increased the probative value of the evidence. (*People v. Lewis, supra,* 46 Cal.4th 1255, 1287; *People v. Wesson* (2006) 138 Cal.App.4th 959, 970 [41 Cal.Rptr.3d 883].) Finally, the two incidents are not remote in time from each other; one occurred in September of 1996, the other in September of 1998. We find that the uncharged acts are similar enough to the charged offenses to have considerable probative value on the issue of lack of consent.

 Against the appreciable probative value of the evidence we balance its prejudicial effect upon the defense. "In general, 'the probative value of the evidence must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses.' [Citation.]" (*People v. Daniels* (2009) 176 Cal.App.4th 304, 316 [97 Cal.Rptr.3d 659].)

The evidence of defendant's inclination to commit forcible sexual assaults was of course damaging to his defense that he did not intend to sexually assault Athena, but was not prejudicial in the sense contemplated by Evidence Code section 352. " 'In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citations.]" (*People v. Callahan* (1999) 74 Cal.App.4th 356, 371 [87 Cal.Rptr.2d 838].) " 'Undue prejudice' refers not to evidence that proves guilt, but to evidence that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on

an improper basis: 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' " ' [Citations.]" (*People v. Walker, supra*, 139 Cal.App.4th 782, 806; see also *People v. Garceau* (1993) 6 Cal.4th 140, 178 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 650–651 [126 Cal.Rptr.2d 876].) Here, the prior sexual offense evidence was, as we have delineated, quite probative to a critical issue in the case, and thus did not carry with it the *undue* prejudice section 352 seeks to avoid. "A trial court should not exclude highly probative evidence unless the undue prejudice is unusually great." (*People v. Walker, supra*, at p. 806.)

Looking at other factors pertinent to the assessment of the prejudicial effect of the evidence, we find the evidence of uncharged sexual assault of Sarah was not more inflammatory than the victim's account of charged offenses. We recognize that defendant was not convicted of the uncharged assaults, which presented the risk of consideration of the evidence by the jury to inflict punishment for uncharged offenses in this proceeding. Although the jury was never directly advised that the sexual assault upon Sarah has not resulted in criminal convictions, questions asked by the prosecutor may have carried the implication that defendant was not tried for the assault upon Sarah.[9] Upon review of the arguments of counsel and the jury instructions, we are persuaded that the jury was not inclined to improperly punish defendant for the uncharged acts. The jury was given an effective instruction by the trial court to consider the evidence only for proper limited purposes, and we must presume the jury adhered to the admonitions. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1023 [80 Cal.Rptr.2d 676].) Upon consideration of both the probative value of the evidence and its prejudicial effect we find that the trial court did not abuse its discretion by admitting the uncharged acts evidence under Evidence Code section 1108. (*People v. Lewis, supra*, 46 Cal.4th 1255, 1288; *People v. Roldan* (2005) 35 Cal.4th 646, 707 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

III.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[9] For instance, the prosecutor asked Sarah if she wondered since the assault occurred "where is this person that did [this] to you," and if she realized this was her "opportunity to be able to actually tell the truth and explain what happened to you back in 1998?"

*See footnote, *ante*, page 1262.

## DISPOSITION

Accordingly, the judgment is affirmed.

Marchiano, P. J., and Banke, J., concurred.

A petition for a rehearing was denied February 1, 2010, and appellant's petition for review by the Supreme Court was denied April 22, 2010, S180310.