Filed 11/19/20  P. v. Brown CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B300031 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA474258) |
| v. | |
| DAVID LAMONT BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed and remanded with directions.

Marilee Marshall for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and Charles J. Sarosy, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

On July 16, 2018, bystander Lexus Scott observed defendant David Lamont Brown punching and struggling with T.J., a minor, in the back seat of a parked car. Scott telephoned 911. Brown ejected T.J. from the car and sped away. While T.J. sat in an ambulance, Los Angeles Police Department (LAPD) Officer Keleigh Edwards asked her if she was "working," a colloquial term referring to prostitution. T.J. responded that she did not want to, but that "he" insisted she get out of the car; when she refused, he punched her and threw her out of the car.

T.J. did not testify at Brown's trial. In her absence, the prosecution played two recordings for the jury: an audio recording of the 911 telephone call placed by Scott and a portion of a body camera video taken while Officer Edwards spoke with T.J. The trial court also permitted the prosecution to call two witnesses, M.W. and W.F., to testify that when they were each 14 years old, they worked for Brown as prostitutes.

The jury convicted Brown of human trafficking of a minor, T.J., for a commercial sex act (count 1), and found true the allegation that he used force or fear against her within the meaning of Penal Code section 236.1, subdivision (c)(2).[1] The jury also found Brown guilty of assaulting T.J. by means likely to cause great bodily injury under section 245, subdivision (a)(4) (count 2), and unlawful sexual intercourse with T.J., a minor more than three years younger than Brown, under section 261.5, subdivision (c) (count 3). The trial court found true the allegation that Brown had a prior felony conviction for human trafficking of a minor, involving M.W. and W.F.

---

[1] All unspecified statutory references are to the Penal Code.

The trial court sentenced Brown to a total of 21 years and eight months to life in state prison. The court also imposed a one-year enhancement under section 667.5, subdivision (b), for service of a prior prison term, but stayed this sentence.

On appeal, Brown argues the admission of the two recordings violated his Sixth Amendment right to confrontation. He also argues permitting both W.F. and M.W. to testify that they worked for Brown as prostitutes when they were 14 years old was so unduly prejudicial that it rendered the trial fundamentally unfair and violated his Fifth and Fourteenth Amendment rights to due process. Finally, Brown argues that pursuant to newly-amended section 667.5, subdivision (b), the one-year sentencing enhancement should be stricken rather than stayed. The People agree, as do we, that the enhancement should be stricken.

For the reasons that follow, we remand for the trial court to strike the one-year enhancement imposed under former section 667.5, subdivision (b), but otherwise affirm the judgment.

## FACTUAL BACKGROUND

### A. T.J. is Arrested for Prostitution

During the night of June 6, 2018, undercover LAPD vice investigator Marco Sanchez posed as a person interested in soliciting the services of a prostitute. T.J. approached his vehicle. After she and Investigator Sanchez agreed that he would pay her

3

in exchange for certain sex acts, he drove T.J. to a predetermined "take-down area," where uniformed officers arrested her.[2]

## B.     Testimony of Brown's Girlfriend

Brown's girlfriend, Jasmine Houston, did not work as a prostitute.  She owned a black Nissan Sentra, which she let Brown use while she was at work.

Sometime in July 2018, Brown and Houston broke up.  Prior to their breakup, Houston and Brown argued about photographs of T.J. on Brown's cell phone and texts of a sexual nature between Brown and T.J.  Despite their breakup, Brown continued to have the keys to Houston's car.

Houston also testified that Brown commonly referred to himself on Instagram by using an image of a blue diamond next to the word "Dave," and confirmed "Diamond Dave" was one of Brown's Instagram names.

## C.     The July 16, 2018 Attack on T.J.

### 1.     *Scott's Observations and Call to 911*

On July 16, 2018, Scott lived one city-block away from the intersection of Figueroa Street and 90th Street.  Scott did not know T.J. or Brown.  Scott heard yelling, including a man saying, "Get out of my car, bitch," and a woman screaming for help.  While standing outside of her apartment, Scott observed, through an open car door, Brown pinning down T.J. in the back seat of a black Nissan Sentra.  Brown and T.J. appeared to be wrestling, and Brown punched T.J. three times.  Brown pulled T.J. out of the car and prevented her from reentering.  T.J. continued to yell

---

[2] Investigator Sanchez did not know T.J.'s name, but he identified a photograph of her as the person he brought to the take-down area that night.

for help, and Scott telephoned 911.  Brown threw some of T.J.'s belongings out of the car and "sped off."

Scott then observed T.J. sitting on the ground.  T.J. was "throwing up or dry heaving, and . . . crying."  She also appeared to have urinated in the spot where she sat.  About a minute after Scott approached T.J., Brown returned in the vehicle.  He threw more of T.J.'s belongings out of the car window and left again.  Scott guided T.J. out of the street to the porch of Scott's apartment, where T.J. sat until an ambulance arrived.  While Scott was on the phone with the 911 dispatchers, Scott observed "a huge gash" on T.J.'s forehead.

T.J. did not testify at Brown's trial.  Scott identified photographs of T.J. as the woman she observed in the altercation with Brown that day.  Scott also identified Brown as the assailant and identified a photograph of Houston's Nissan Sentra as the car in which Brown assaulted T.J.

The prosecution played a recording of Scott's 911 call for the jury.  During the call, Scott described her observations to a fire department dispatcher and then to an LAPD dispatcher.  She also made three statements not within her own knowledge to the dispatchers.  First, the fire department dispatcher asked Scott how old T.J. appeared to be.  Scott estimated that T.J. was 22 years old.  After a statement from T.J. that was not transcribed, Scott exclaimed, "She's seven—oh my God, she's 17."

Second, the call was transferred to the LAPD dispatcher, who asked Scott if Brown was T.J.'s boyfriend.  Scott responded, "she told me no but she does know the, she says she does know the gentleman but I'm not sure about the relationship."

Third, during her conversation with the LAPD dispatcher, Scott exclaimed, "Are you serious?!"  The dispatcher asked, "What

did she say, what did she say?" Scott responded, "She was saying that—because I was asking, because they were parked in front of my apartment when I came and I was asking how long was she here fighting with this man before I came. And she was saying they were actually somewhere else when the altercation started and that's where he actually like busted her head open."

2. *Officer Edwards Questions T.J.*

While the paramedics treated T.J. for the injury to her forehead, Officer Edwards spoke with her. Out of the presence of the jury, the trial court reviewed a video recording of the discussion between the officer and T.J., and found that while they spoke, T.J.'s respiration was "obviously quite labored," and she had tears streaking down her face. The prosecution played the following portion of their recorded conversation for the jury:[3]

"[Officer] Edwards: Okay. And what happened today?

"[T.]J.: . . .

"[Officer] Edwards: Were you working?

"[T.]J.: [shakes head negatively] I didn't want to, that's why this happened.

"[Officer] Edwards: Okay, did you know that's what you were coming out here for?

"[T.]J.: . . .

"[Officer] Edwards: It's okay if you were. I'm just trying to get the full story so I understand.

"[T.]J.: He told me to get out the car on 95th, on 90th and Figueroa and I said no, I didn't want to.

"[Officer] Edwards: Okay.

---

[3] The nonverbal descriptions included below are reflected in the transcript that was provided to the jury.

6

"[T.]J.: And he said, and he asked one more time and he said, 'If you don't get out, I'm gonna hurt you.' I said, 'But I really don't wanna go. I don't feel comfortable.' And then, he was like, 'You take too long to get dressed. Now, you don't wanna get out my car?!' And then he just start[ed] hitting me. And then we pulled over like three blocks down in the back street somewhere. I think he made a right or something. I'm not sure. We pulled a few blocks down and he hit me in my head again and then it just split open and it start squirting, blood start squirting out. Blood got in my eye and I just blacked out. And the next thing you know, I was over here. And he was on top of me, like, 'Get out my car!' Like, 'Go!'

"[Officer] Edwards: What did he hit you in the head with?

"[T.]J.: [makes a fist with left hand] His hand; he punched me.

"[Officer] Edwards: Okay, so this was from his fist [pointing to cut on victim's forehead]. He didn't hit you with any objects?

"[T.]J.: [shakes head negatively]

"[Officer] Edwards: Okay. And then he drove you over here and that's when he threw you out?

"[T.]J.: [nodding head affirmatively]

"[Officer] Edwards: Was he hitting you over here too?

"[T.]J.: Yeah. I asked him to take me to the hospital or something because of my head was like . . . . And he was like, 'No, walk,' or something. So, then he just started like, hitting me again and then he said, 'I feel like killing you right now!' So, that's when he was like trying to throw me out the car. I was getting like hit so I couldn't see what was coming."

At trial, Officer Edwards also testified that T.J. directed the officers to a corner of 90th and Figueroa Streets, where they found T.J.'s cell phone lying in the street.

**D.      Sexual Assault Examination of T.J.**

On July 17, 2018, a nurse conducted a sexual assault examination of T.J.  During the examination, the nurse observed bruising on T.J.'s right forearm, left shoulder, back of her left shoulder, left eye, chin, and inside her left cheek; a scratch about eight centimeters long on her upper left breast; a cut above her left eye; and an abrasion inside her left cheek.  The nurse also took several DNA sample swabs, which revealed Brown's DNA in anal and vaginal swab samples taken from T.J.

**E.      Officers Arrest Brown**

On July 20, 2018, Detective Jose Rodriguez and two of his partners located Brown at an address on Paramount Boulevard and recovered from him a set of car keys belonging to Houston. Houston's black Nissan Sentra was across the street.  While detaining Brown, the officers photographed a diamond tattoo on the right side of Brown's face, below his eye.  Brown denied knowing T.J.  When Detective Rodriguez asked whether Brown was at the location where Scott's apartment was located, Brown responded that if his GPS showed that Brown was there, then he was there.

**F.      Testimony of W.F. and M.W.**

In 2014, when W.F. was 14 years old, she worked as a prostitute for Brown.  During the time she worked for him, W.F. lived at Brown's house and he provided her anything she needed. Brown educated W.F. about how to behave while working for him.  While working for him as a prostitute, Brown took W.F. to

8

an area on Figueroa Street, where she acknowledged prostitution is commonly practiced. W.F. also testified that M.W. worked for Brown as a prostitute, and stated that it was W.F.'s idea that M.W. do so. W.F. did not reveal their true ages to Brown, telling him she was 17 years old, and M.W. was 16 years old.

M.W. testified that in 2014, when she was 14 years old, she met Brown through her friend W.F. Shortly after meeting Brown, M.W. and Brown were arrested. At trial, M.W. repeatedly denied working as a prostitute for Brown. However, the prosecution played a 2014 audio recording between M.W. and Detective Satwan Johnson for the jury. During that recording, M.W. told Detective Johnson she provided money she earned from prostitution to Brown, and Brown purchased clothes for her to use when she worked as a prostitute.

### G.    Testimony of the Prosecution's Expert Witness

Detective Johnson testified as the prosecution's human trafficking expert. He explained that individuals known as pimps may persuade, entice, or manipulate young girls and women into the commercial sex trade. Some pimps, known as Romeo or boyfriend pimps, present themselves as someone who cares for the woman and may clothe her, feed her, or house her. In this way, the pimp systematically gains her trust and convinces her to work for him as a prostitute and give him any money she earns. Other pimps, known as gorilla pimps, use aggression and violence to attain compliance with their demands, which could include punching, slapping, or hitting with a belt. The majority of pimps are a hybrid between these two types.

According to Detective Johnson, the area along Figueroa Street intersected by the streets numbered in the 90s is a "pimp-

controlled" area, which is an area that a gang or a number of pimps control.

Detective Johnson explained that pimps typically require their prostitutes to get a tattoo on their face as a way of branding them, to show other pimps they are his "property." He further testified that T.J. had a diamond tattoo on her forehead, which he opined was a brand. Detective Johnson opined that another tattoo on T.J.'s arm depicting the word "loyalty" referred to her loyalty to her pimp.

Detective Johnson also reviewed a number of Brown's Instagram posts under the pseudonym "Diamond Dave" and described how each related to pimping. For example, one post stated, "I been done with 9 to 5. Bitch it's 304's [*sic*] only." Detective Johnson testified 304 spells out the word "hoe," a slang term for a prostitute. In another post, Brown stated, "Can't wait to break this bitch," which Detective Johnson explained meant to take money from a prostitute after she committed an act of prostitution. Another post stated, "I can honestly say I appreciate ma bitches. Keep it up lil [*sic*] hoes," and included a picture of several feet. Detective Johnson stated that the picture of the feet alluded to the expression "ten toes down," which refers to a prostitute making money for her pimp.

## H.    T.J.'s Birth Certificate

The trial court admitted T.J.'s birth certificate as proof that she was 17 years old at the time of the charged offense.

## DISCUSSION

### A. The Trial Court Did Not Err in Admitting the 911 Recording

Brown contends the trial court erred in admitting the recording of Scott's 911 call in violation of his Sixth Amendment right to confrontation. During trial, Brown objected to the introduction of the 911 recording on the ground that it did not qualify as a spontaneous statement and was precluded by the decision in *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*).

In *Crawford*, the Supreme Court noted a difference between testimonial and nontestimonial out-of-court statements, and clarified that testimonial statements are the primary object of the Confrontation Clause. (*Crawford*, *supra*, 541 U.S. at pp. 51-53.) In *Davis v. Washington* (2006) 547 U.S. 813 [126 S.Ct. 2266, 165 L.Ed.2d 224), the Supreme Court provided further clarification concerning the type of statements that are deemed to be testimonial, holding as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822, fn. omitted.)

In *Michigan v. Bryant* (2011) 562 U.S. 344 [131 S.Ct. 1143, 179 L.Ed.2d 93], the Supreme Court again recognized that "not all 'interrogations by law enforcement officers' [citation] are subject to the Confrontation Clause." (*Id.* at p. 355, fn. omitted.)

11

Relying on the analysis in *Bryant*, our state Supreme Court summarized six guidelines courts should consider in examining the primary purpose of an interrogation. (*People v. Blacksher* (2011) 52 Cal.4th 769, 813-815.) First, "[t]he court must objectively evaluate the circumstances of the encounter along with the statements and actions of the parties." (*Id.* at p. 813.) Second, "[t]he court should consider whether an ' "ongoing emergency" ' exists, or appears to exist, when the statement was made." (*Id.* at p. 814.) Third, "[w]hether an ongoing emergency exists is a 'highly context-dependent inquiry.' [Citation.] Even when a threat to an initial victim is over, a threat to first responders and the public may still exist." (*Ibid.*) Fourth, "[t]he medical condition of the declarant is a relevant consideration, as it bears on both the injured declarant's purpose in speaking and the potential scope of the emergency." (*Ibid.*) Fifth, "[a] nontestimonial encounter addressing an emergency may evolve, converting subsequent statements into testimonial ones." (*Ibid.*) "Finally, regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations. Inquiries that are conducted in a disorganized way and in turbulent circumstances are distinguishable from a jailhouse interview, as in *Crawford*, or the sequestered and formal preparation of an affidavit . . . . [Citation.]" (*Id.* at p. 815.)

Viewed objectively, T.J.'s statements to Scott, as relayed by Scott to the dispatchers, were not elicited by Scott as part of a formal investigation. Further, the circumstances during Scott's 911 call indicated there was an ongoing emergency. At the start of the call, Scott advised that a woman had been beaten. The initial dispatcher's questions focused on ascertaining the location

12

of the incident, the extent of the victim's injuries, and the whereabouts of the assailant.  Scott's second discussion with the LAPD dispatcher centered on a description of the assailant, who was still at large, and an assessment of any weapons used during the attack.  These questions were posed in response to a report of a violent event and were necessary to establish the scope of the emergency, and to assist in coordinating a response by emergency services personnel.  They "were the exact type of questions necessary to allow the police to ' "assess the situation, the threat to their own safety, and possible danger to the potential victim" ' and to the public." (*Michigan v. Bryant*, *supra*, 562 U.S. at p. 376, quoting *Davis v. Washington*, *supra*, 547 U.S. at p. 832).  Therefore, the statements during the 911 call were nontestimonial and did not implicate the Confrontation Clause.

**B.**    **The Trial Court Did Not Err in Admitting the Body Camera Video**

Brown also challenges the admission of the body camera recording of the interaction between Officer Edwards and T.J. on the ground that its admission violated the Confrontation Clause.  While Brown asserted the Confrontation Clause argument under *Crawford* with respect to the 911 call, he failed to squarely raise a *Crawford* objection with respect to the body camera recording.  We conclude that Brown forfeited his challenge under the Confrontation Clause.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 186 [" ' "questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal" ' "].)  We nonetheless exercise our discretion to consider this issue on the merits.  (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1030, fn. 10 ["where an otherwise forfeited

claim presents an important question of constitutional law or a substantial right, the appellate court may exercise discretion to review the claim"].)

The circumstances of the encounter between T.J. and Officer Edwards demonstrate the primary purpose of Officer Edwards' questioning was not to gather evidence for trial. At the time Officer Edwards began to question T.J., she could not yet conclude that the emergency had ended and that there was no threat of violence to law enforcement or the public. Although the record does not reflect how much time had elapsed since the assault, the fact that T.J. continued to have labored respiration and had tears streaming down her face, suggests that Officer Edwards spoke to T.J. close in time to the assault. Officer Edwards did not know who the assailant was, his relationship to T.J., what he had used to injure T.J., whether the assailant would return to the location a third time, or whether he was likely to injure others.

Further, "the informality of the statement and the circumstances of its acquisition" also weigh in favor of finding the statements were nontestimonial. (*People v. Blacksher*, *supra*, 52 Cal.4th at p. 815.) T.J. made her statements while she was in distress in the back of an ambulance. The statements were not made during a structured question and response interaction. Rather, one of the things that is striking about T.J.'s statements is that she made them during a lengthy narrative, not directly responsive to the immediate "yes or no" question put to her by Officer Edwards. Based on the surrounding circumstances, we conclude the statements were not testimonial. (See, e.g., *Michigan v. Bryant*, *supra*, 562 U.S. at pp. 376-377 [holding shooting victim's statements were nontestimonial when he was

14

questioned in a gas station parking lot prior to the arrival of emergency medical services, by multiple officers in a disorganized fashion]; *People v. Brenn* (2007) 152 Cal.App.4th 166, 178 [holding stabbing victim's answers to police questions as he waited for paramedics were not testimonial although police had arrested assailant moments before].)

## C.     Any Error in Admitting the 911 Recording or Body Camera Video Was Harmless

Assuming, arguendo, that the recordings constitute testimonial hearsay, a violation of the Confrontation Clause is subject to review to determine if the error was harmless beyond a reasonable doubt.  (*People v. Garton* (2018) 4 Cal.5th 485, 507, citing *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].)  In determining whether the error is harmless, we consider " 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " (*People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1225, fn. omitted, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684 [106 S.Ct. 1431, 89 L.Ed.2d 674].)

The record demonstrates the statements on the 911 and body camera recordings were duplicative of other evidence at trial.  T.J.'s birth certificate established she was a minor on July 16, 2018.  Investigator Sanchez's testimony concerning his arrest of T.J. just one month earlier in June 2018 for prostitution established that T.J. recently had worked as a prostitute. Houston's testimony that she saw a photograph of T.J. on

Brown's cell phone and texts of a sexual nature between them, as well as the DNA samples, established that Brown and T.J. knew each other and had a sexual relationship.

Further, the prosecution's expert, Detective Johnson, testified that pimps brand their workers. He opined the diamond tattoo on T.J.'s forehead was such a brand. Indeed, the evidence demonstrated Brown uses the Instagram name "Diamond Dave" and also has a diamond tattoo on his face. Detective Johnson opined that Brown engaged in communications on Instagram typical of pimps. He also testified that the area where Brown attacked T.J.—and where her cell phone was found—was a well-known pimp-controlled area.

Moreover, Detective Johnson testified that pimps use violence against their workers to control them, including punching them. Scott observed Brown punching T.J. three times one city-block away from the pimp-controlled neighborhood. T.J. suffered from several cuts and bruises as well as "a huge gash" on her forehead.

Taken together, the evidence is sufficient to establish beyond a reasonable doubt that Brown induced a minor to engage in an act of prostitution by use of force, fear or violence; inflicted great bodily injury on T.J. during the course of an assault; and engaged in sexual intercourse with her. Based on the strength of the prosecution's case, any error in admitting the two recordings is harmless.

## D. The Trial Court Did Not Abuse Its Discretion in Permitting Testimony by W.F. and M.W.

At trial, the People presented W.F.'s and M.W.'s testimony pursuant to Evidence Code section 1108, subdivision (a), to show that Brown had a propensity to engage in the trafficking of

16

minors for commercial sex.[4]  Brown argues the admission of this evidence concerning two 14-year-old girls was so inflammatory and prejudicial that it rendered his trial fundamentally unfair, in violation of the federal due process clause.

"The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.)  Under Evidence Code section 1108, a court may admit propensity evidence of a sexual offense if it "is not inadmissible pursuant to [Evidence Code s]ection 352." (*Id.*, subd. (a).)  Thus, " '[t]he evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters.' [Citation.]" (*People v. Williams* (2016) 1 Cal.5th 1166, 1196.)

" ' "In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1276.)  " ' "Undue prejudice" refers not to evidence that proves guilt, but to evidence that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on an improper basis.' " (*Id.* at. pp. 1276-1277.)

---

[4] Evidence Code section 1108, subdivision (a), states:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

We review the admission of evidence under Evidence Code section 1108 for an abuse of discretion. (*People v. Williams*, *supra*, 1 Cal.5th at pp. 1196-1197.)

The evidence of Brown's involvement with W.F. and M.W. was relevant to establish Brown's manner of conducting his pimping operation and managing the prostitutes who worked for him. Their testimony showed that he had worked with minors in the past and developed personal relationships with them, as he did with T.J. Also, W.F. testified that she worked in the vicinity of Figueroa Street where prostitutes commonly work, the same area where T.J.'s cell phone was found, and a block away from where Scott observed Brown assault T.J. This evidence tended to corroborate the charge of trafficking of a minor for commercial sex involving T.J. (See *People v. Hollie*, *supra*, 180 Cal.App.4th at p. 1274 [" 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense' "].)[5]

Although Brown focuses on W.F.'s and M.W.'s actual ages, the jury learned that W.F. lied to Brown and told him she was 17 years old and M.W. was 16 years old. Also, their testimony centered on Brown's day to day pimping operations and did not include any reference to the use of force, fear, or violence. We conclude that although the testimony by W.F. and M.W. may have been damaging, it was not so prejudicial as to outweigh its probative value. (*People v. Hollie*, *supra*, 180 Cal.App.4th at

---

[5] The offenses Brown committed with W.F. and M.W. in 2014 were not remote in time because Brown was imprisoned during the interim period for convictions related to W.F. and M.W. (See *People v. Hollie*, *supra*, 180 Cal.App.4th at p. 1276 [two sex offense incidents, committed within two years of each other, were not remote in time].)

pp. 1276-1277.) Therefore, the trial court did not abuse its discretion, and the admission of the evidence did not render the trial fundamentally unfair under the due process clause. Moreover, for the reasons discussed above, due to the strength of the prosecution's case, any error was harmless.

Because we have found no error in the trial court's admission of the recordings or W.F.'s or M.W.'s testimony, Brown's cumulative error argument fails. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1225; *People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

## E.     The One-year Sentencing Enhancement Imposed Under Section 667.5 Must be Stricken

At the time of Brown's sentencing, section 667.5, subdivision (b), imposed a one-year enhancement for each prior separate prison term served. Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b), to apply only when the defendant served a "separate prison term for a sexually violent offense *as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code*." (§ 667.5, subd. (b), italics added; see Sen. Bill No. 136 (2019-2020 Reg. Sess.) § 1.) Brown's prior prison term was based on a conviction of human trafficking under section 236.1, subdivision (c). That crime is not enumerated under Welfare and Institutions Code section 6600, subdivision (b). Thus, under the newly-amended version of section 667.5, a one-year sentencing enhancement could not be imposed.

Because the judgment against Brown is not yet final, he is entitled to the retroactive benefit of the change in the law. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341 [finding Sen. Bill No. 136 applies to non-final judgments on appeal]; see *In re Estrada* (1965) 63 Cal.2d 740, 744-746 [absent evidence of

legislative intent to the contrary, ameliorative statutory amendments apply to all defendants whose judgments are not yet final].)

## DISPOSITION

The matter is remanded to the superior court with instructions to strike the one-year enhancement imposed under section 667.5, subdivision (b).  In all other respects, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED


FEDERMAN, J.[*]


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.