Filed 3/10/16  P. v. Tate CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B258141 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. YA088017) |
| DEBBIE ANN TATE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven R. Van Sicklen, Judge.  Affirmed.

Lise M. Breakey, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Debbie Ann Tate appeals from the judgment entered following her conviction by jury of one count of assault with a deadly weapon. She contends the trial court erred in admitting evidence of two prior acts of misconduct. We conclude the trial court erred in admitting one of the two prior acts, but the error was not prejudicial. We therefore affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A.    *Procedural Background*

The Los Angeles County District Attorney (the People) filed an information on September 9, 2013 charging defendant with one count of assault with a deadly weapon, a knife, upon her daughter, Demariya A.[1] (Pen. Code, § 245, subd. (a)(1).) The information further alleged defendant suffered a serious or violent prior felony conviction within the meaning of Penal Code sections 667, subdivisions (a) through (j), and 1170.12, subdivision (b).

At the conclusion of trial, the jury convicted defendant on count one as charged. Defendant waived jury trial on the prior conviction allegations and the court subsequently found the allegations true. The court sentenced defendant to a total of 11 years in state prison, consisting of a base term of three years on count one, doubled to six years pursuant to Penal Code section 1170.12, subdivision (b), and an additional five years for the prior conviction pursuant to Penal Code section 667, subdivision (a)(1), to run consecutively to count one. Defendant timely appealed.

### B.    *Prosecution Case*

#### 1.    *The Stabbing*

In July 2013, defendant lived with her 16-year-old daughter, Demariya. Defendant's 24-year-old son, Steven Rembert, had been staying with them for a few

---

[1] The parties referred to Demariya (a minor) by her first name throughout the trial. We adopt the same convention; no disrespect is intended.

2

weeks. On July 28, 2013, defendant and Rembert got into an argument, which ended with defendant stabbing Demariya.

At trial, Demariya testified reluctantly for the People. On the morning on July 28, 2013, she was home with her mother and her brother, Rembert. Defendant and Rembert were drinking beer together. According to Demariya, defendant became intoxicated and began yelling at Rembert. Demariya was upset with defendant because defendant had said "she wasn't going to drink anymore."

When the argument began, Demariya was in her bedroom and defendant and Rembert were in the living room. As Demariya entered the living room, she saw the two yelling at each other and Rembert approaching defendant. Rembert then grabbed defendant's arms and pushed defendant to the ground.[2] Demariya got "in between them" and told them to "stop arguing." Rembert moved her "out of the way" and he and defendant continued verbally arguing. Defendant told Rembert to leave the house, so he and Demariya went into Demariya's bedroom and began to pack Rembert's bags.

At some point, defendant and Rembert began arguing again and defendant came into the bedroom. Demariya told defendant and Rembert she did not like their drinking, and "they wouldn't have been arguing if they hadn't been drinking." Defendant left the room and Rembert followed, still arguing. Demariya did not see where they went. Rembert then reentered Demariya's bedroom, followed by defendant, who looked angry. Rembert and defendant were still arguing; then Rembert pushed defendant down and "pinned her to the ground." Rembert got on top of defendant with his hands pinning her arms. Demariya unsuccessfully tried to get Rembert off defendant. Rembert eventually got up while defendant was screaming. Defendant left and went into her bedroom. When defendant returned a short time later, Demariya testified she saw tears on her mother's face, but did not see her hands. At this point, Demariya was between her mother and brother, facing Rembert, with her back to defendant and the bedroom

---

[2] According to her children, defendant is between four feet eleven inches and five feet two inches tall. Rembert is six feet tall and weighs 200 pounds.

3

doorway. Defendant was yelling and arguing with Rembert. Rembert then "attempted to go for [defendant] again," and Demariya told him to stop. Demariya recalled there was "kind of a struggle" between defendant and Rembert, and she was "in the middle of them . . . grabbing and stuff." Rembert was "reaching over" Demariya's head to grab defendant and Demariya was "trying to push him away." Demariya was using both hands to try to restrain Rembert, to "keep him away from my mom."

At this point, Demariya felt a pain in the back of her left shoulder. She realized defendant had "cut" her with a knife. Demariya did not see the knife or defendant's action to cut her.[3] She started to bleed and the argument stopped as defendant and Rembert tried to assist her. She estimated the entire argument and altercation lasted about 40 minutes.

Demariya called 911. She testified that she was "hysterical" and crying at the time because she was in pain. The tape of the 911 call was played for the jury. During the call, Demariya asked the 911 operator to "get an ambulance, my mom just stabbed me." Demariya, Rembert and defendant waited together for the ambulance and the sheriff's deputies, who arrived within minutes.

The People impeached Demariya with her preliminary hearing testimony. At the preliminary hearing, Demariya did not testify Rembert had pushed defendant to the ground twice (once in the living room and then again in the bedroom), but only once, in the living room. Demariya acknowledged that her memory was better at the time of the preliminary hearing in August 2013 (about a month after the incident) than at trial in January 2014, but insisted that Rembert had pushed defendant down twice. As for the confrontation in the bedroom, she testified at the preliminary hearing that Rembert pushed defendant, Demariya got in the middle, telling him to stop, and that was when defendant cut her. When confronted with her prior testimony, Demariya clarified at trial

---

[3] Demariya remembered defendant had been eating an apple in her bedroom earlier that day; she presumed defendant had a knife, because it was defendant's habit to peel her apples with a knife.

that she did not see Rembert hit defendant during the final "struggle" in the bedroom. She also admitted that defendant was mad at her, as well as at Rembert.

2.      *Investigation and Arrest*

Los Angeles County Deputy Sheriff Christopher Quinones testified that he responded to the 911 call on July 28, 2013. When he first encountered Demariya, she was exiting the residence, bleeding and "obviously in pain." Demariya told him "very briefly that her mom had stabbed her." Deputy Quinones and his partner detained defendant and Rembert pending investigation.

Deputy Quinones then interviewed Demariya in greater detail. At that point, she was seated on the front porch of the residence and was "obviously upset or shaken or in pain" and was crying. Demariya stated that defendant and Rembert had been involved in an argument. Then, "for an unknown reason, the argument became very heated, and [defendant] retrieved a kitchen knife from the kitchen and attacked" Demariya. Rembert tried to take the knife away from defendant but was not able to do so until after Demariya was stabbed. Demariya told the deputy that defendant had been "drinking heavily all day" and that defendant was mad at Rembert and at Demariya "for an unknown reason." During this interview, Demariya did not claim that the stabbing was accidental or done in self-defense.[4] The interview ended after several minutes when the paramedics arrived and began to treat her wound.

Next, Deputy Quinones interviewed Rembert, who had been placed in the back of a patrol car. Rembert stated that he and defendant were involved in an argument that "began to get heated." Defendant "had been drinking Colt 40 (sic) malt liquor" and was drunk. At that point, "for an unknown reason, [defendant] turned her aggression towards

_____

[4] At trial, Demariya did not deny making these statements to Deputy Quinones, but claimed she "kind of lied" during the interview at the scene. Specifically, she claimed she lied when she told the deputy that defendant was "mad at me too," "intentionally stabbed me" and that defendant "walked in the room and attacked me, and my brother tried to stop her." Instead, she claimed at trial that she did not really believe defendant was mad at her and she knew defendant had stabbed her "on accident [sic]." She explained that, at the time of the interview, she was upset and crying and in pain.

5

Demariya, retrieved a kitchen knife, and then walked up to Demariya, who was in her room, and attacked her with the knife." According to Deputy Quinones, Rembert "specifically, with hand motions, described that [defendant] had walked up to [Demariya] and stabbed her with the knife," demonstrating that defendant had lifted up the knife "in an overhand grip and then struck the hand down as if she was puncturing the knife into an object in front of her." Rembert stated he then wrestled the knife away from defendant. Rembert described the knife as a silver kitchen knife with a blue handle, and signed a consent form allowing the deputies to enter the residence to retrieve the knife. He identified the knife found in the residence as the one defendant used to stab Demariya.

The People also presented testimony from three medical personnel witnesses. Emergency medical technician Scott Engelmann treated Demariya at the scene. When he arrived, Demariya was sitting outside the front door "in moderate to severe distress hunched over crying." She was holding her shoulder and bleeding. Demariya told him she had been arguing with her mother and when Demariya attempted to leave, "her mother had grabbed a butter knife from the kitchen and stabbed her." A second emergency medical technician, who rode in the ambulance with Demariya to the hospital, testified Demariya told him "something along the lines [of] her mother went crazy and took a butter knife and stabbed her." Similarly, the emergency room physician who treated Demariya on the night of the stabbing testified she stated she was "stabbed at home by her mother."

Demariya was briefly treated at the hospital and released; the laceration did not require stitches. She did not sustain any lasting injuries other than a small scar.

### 3. *Prior Acts*

Over defendant's objection, the court allowed evidence of two prior incidents involving defendant. First, in July 2003, defendant was involved in an altercation with her niece, Nicole Barton. In the instant trial, Barton was escorted to court by investigators for the prosecution after failing to appear pursuant to her trial subpoena. She testified that she did not recall any of the details of the 2003 incident. The responding police officer, who interviewed Barton at the scene, testified to the statements

6

she made at the time. Barton told him she had gotten into a dispute with defendant and defendant approached Barton's room holding "a pot and a knife." Defendant told Barton to "Come out here. I'll fuck you up. I'll cut you, bitch." Defendant then ran toward Barton with the pot "elevated above her head in a striking motion," but was tackled by other family members before reaching Barton.

The People also offered evidence of an incident that occurred in September 2009. Demariya, who was 12 years old at the time, testified that she was in the car with defendant and defendant's boyfriend, Albert Martin; Martin was driving. Martin and defendant began arguing because he would not buy cigarettes for defendant. Martin threw defendant out of the car. Defendant became angry and "tried to throw a pot" at Martin. At trial, Demariya claimed she could not remember other details of the incident.

Martin testified that he had been in a romantic relationship with defendant for seven years. As he recalled the 2009 incident, he and defendant had a verbal argument while driving home, but there was no physical contact. He stopped the car and let defendant out. After they got out of the car, defendant threw a pot at him because he "wouldn't cooperate"; he "knocked it down" with his hand. He described the pot as a plastic, six inch "chia pot." He denied telling the police that defendant had struck him while they were in the car or that the pot was heavy and ceramic.

However, the responding officer, Jason Clark, testified that Martin reported at the time that defendant "began hitting him" during their argument, and then picked up a "heavy flowerpot, and attempted to throw it at him." Officer Clark also testified that while he was arresting defendant as a result of this incident, she told Martin "she was going to get someone to take care of him." According to the officer, defendant claimed she never hit Martin, and while she did pick up a pot, she did not throw it.

7

C.    *Defense Case*

Rembert testified for the defense.[5]  Before arriving at defendant's house on the day of the stabbing, he had shared a pint of Hennessy with a friend.  He was intoxicated when he arrived and then continued to drink beer at defendant's house.  He also saw defendant drinking a beer.

Rembert testified he and defendant began arguing about 30 minutes to an hour after he arrived, because he had left wet clothes on the bathroom floor.  According to Rembert, defendant yelled at him to leave the house because he was being disrespectful.  He responded in an "angry manner," and refused to leave.  Defendant threatened to call the police if Rembert did not leave.

Rembert left the house for a few minutes and smoked some marijuana to calm himself down.  He returned to the house and started to argue with defendant again.  Rembert testified that he pushed defendant, "like a regular tap push," to which defendant responded by stating "don't put your hands on me, bitch."  Rembert then "got mad," grabbed defendant, "pushed her down hard" and she fell.[6]  This occurred in the hallway between the living room and the bedrooms.  He advanced toward defendant and Demariya grabbed him and held him back.  He heard Demariya start to scream.  Once he realized that Demariya got "hit" with the knife, he stopped arguing and turned to focus on helping his sister.

Rembert denied seeing defendant holding a knife.  He denied or claimed he could not remember most of the statements attributed to him in the police report (based on his interview at the scene with Deputy Quinones), including that he saw defendant walk up to Demariya and stab her, and that he wrestled the knife away from defendant.  He did identify the knife showed to him by police as the one defendant used to stab Demariya.  He claimed that "it was an accident.  My sister hopped in front and accidently got hit."

---

[5] At the time of trial, Rembert was in custody on an unrelated charge.  The court admonished the jury not to speculate regarding his inmate attire.

[6] On redirect, after reviewing his preliminary hearing testimony, Rembert said that he got on top of defendant after pushing her to the ground and grabbed her by the shoulders.

8

Defendant did not testify at trial.  In closing, her counsel argued that defendant "did not intend to stab her daughter.  She acted in self-defense.  She was fighting off her son who had thrown her to the ground. . . .  She picked up that knife to end the attack by her son.  She didn't mean to hit Demariya with the knife."

## DISCUSSION

Defendant argues the court erred in admitting her prior acts of misconduct in 2003 and 2009.  She contends that these prior acts were admitted based on a purported pattern of violence followed by a claim of self-defense, but in fact, there was no evidence that defendant claimed self-defense after either incident.  Thus, she argues there was no basis to admit the prior acts and she was prejudiced as a result of their admission.  We agree with defendant that the 2009 incident was erroneously admitted, but we find the error was harmless in light of the proper admission of the 2003 incident and the evidence supporting the current charge.

A.     *Legal Principles*

As a general rule, evidence of a person's character, including evidence of specific instances of uncharged misconduct, is inadmissible to prove the conduct of that person on a specific occasion.  (§ 1101, subd. (a).)[7]  This type of evidence is sometimes referred to as criminal disposition or propensity.  (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1609.)  The rule, however, is qualified by section 1101, subdivision (b) (section 1101(b)), which permits admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident."

Section 1109, subdivision (a) sets forth an exception to the rule regarding propensity evidence for domestic violence cases.  Thus, "evidence of the defendant's commission of other domestic violence" is admissible as character evidence tending to prove the charged conduct, subject to section 352.  (§ 1109, subd. (a).)  The admissibility

---

[7]All further statutory references are to the Evidence Code unless otherwise indicated.

of propensity evidence under section 1109 "reflects the legislative judgment that in domestic violence cases, . . . similar prior offenses are 'uniquely probative' of guilt in a later accusation," given the "'typically repetitive nature' of domestic violence." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532.)

Although evidence of prior acts may be admissible under section 1101(b) or section 1109, that evidence may nevertheless be inadmissible under section 352 if it is unduly prejudicial. A determination of inadmissibility under section 352 requires the balancing of the probative value of the evidence against its potential prejudicial effect. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404-405 (*Ewoldt*).) "Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.] But Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (*People v. Quang Minh Tran* (2011) 51 Cal.4th 1040, 1047.)

We review a challenge to a trial court's decision to admit prior misconduct evidence for abuse of discretion. (See, e.g., *People v. Kipp* (1998) 18 Cal.4th 349, 369-371.) "A court abuses its discretion when its ruling 'falls outside the bounds of reason.' [Citation.]" (*Id*. at p. 371.)

B.      *Factual Background*

Prior to trial, the People moved to admit evidence of three prior instances of misconduct by defendant pursuant to section 1101(b).

In addition to the incidents in 2003, in which defendant ran toward her niece armed with a knife and pot, and 2009, in which defendant threw a pot at her boyfriend, the People also sought to admit defendant's 1994 conviction for assault with a deadly weapon (Pen. Code § 245, subd. (a)(1)). According to the preliminary hearing testimony of the victim, who was defendant's neighbor, she and defendant got into an argument, defendant began to yell and threaten her, and then defendant stabbed her in the chest and

arm with a kitchen knife. Defendant entered a plea of nolo contendere to the assault charge.[8]

At the initial hearing on the motion to admit the prior act evidence, the prosecutor argued that all three incidents were relevant to defendant's self-defense claim, as "she offers this false claim each time." The court asked whether there was a self-defense claim in all three prior cases and the prosecutor confirmed that there was. The prosecutor then corrected the record, stating there was no self-defense claim as to the 2003 incident. The court stated it believed "these incidents would be helpful" to the jury "in determining what [defendant's] state of mind was," but noted it was concerned that admitting all three prior incidents would be "piling on" and increase the "tendency for a jury to convict" based on defendant's prior misconduct. The court then concluded that the 2009 incident, in which defendant threw a pot at her boyfriend, was the "least similar," as it did not involve a knife, and the other two incidents were admissible as they were "similar and there is a claim of self-defense in those as there is" in the instant case. Thus, the court was inclined to allow the 1994 conviction and the 2003 incident, "because there were claims of self-defense. That's the claim here."[9]

The prosecutor also moved "for appellate purposes" to introduce all three incidents (the 1994 conviction and the 2003 and 2009 altercations) under section 1109. The court indicated it did not think section 1109 would apply.

During further argument on the matter, defense counsel pointed out that the proposed evidence regarding the 1994 conviction did not contain a claim of self-defense by defendant. The court noted again that "one of the reasons I allowed" the prior incidents was "because of an M.O.; start a fight, claim self-defense." Without the self-defense connection, "it gets now closer to just propensity." The court turned again to the 2009 incident involving defendant's boyfriend, which it had previously excluded, noting

---

[8]This conviction is the basis for the prior strike allegations in the current case.

[9] During the initial discussion on this issue, it appears the court remained unclear whether the 2003 incident involved a claim of self-defense, even though the prosecutor had already stated that it did not.

11

that it "seems to be more in line with the theory of the People that [defendant] gets involved in these altercations and then claims . . . she's acting in self-defense." The prosecutor confirmed that was the theory he was raising. The court concluded "I think I should just reverse myself and let [the 2009 incident] in and exclude the [1994 conviction]," because the 2009 incident was "closer [in time]. Otherwise, I agree with [defense counsel]. We're really talking now propensity."

The People presented testimony about the 2009 incident from Demariya, Martin, and the responding police officer. Prior to presentation of the 2003 incident involving defendant's niece, the court heard further argument on its admissibility. The prosecutor argued that "the repeated number of times Ms. Tate arms herself and goes to attack somebody" was relevant to show her intent, whether or not she later claimed self-defense in the prior incidents. The court noted that it excluded the 1994 conviction because of its age and because there was no claim of self-defense. However, the 2003 incident was factually "very similar" and admissible under section 1101(b) to show "motive, intent, and state of mind," even without a parallel claim of self-defense. The People called Barton and the responding police officer to testify about the 2003 incident.

At the close of trial, the prosecution requested a jury instruction reflecting the admission of the 2009 incident involving defendant's boyfriend as evidence of domestic violence under section 1109. The court indicated that the 2009 incident was admitted under both sections 1101 and 1109. Accordingly, the court instructed the jury that the 2003 and 2009 incidents could be considered as evidence of defendant's intent (CALCRIM No. 375) and the 2009 incident could also be used to show defendant's propensity to commit domestic violence (CALCRIM No. 852).

C.     *No Error in Admission of 2003 Incident*

Defendant contends the trial court erred in admitting evidence of the 2003 incident under section 1101(b). We disagree.

In *Ewoldt, supra*, 7 Cal.4th 380, our Supreme Court explained that the admissibility of evidence pursuant to section 1101(b) depends on the degree of similarity between the uncharged act and the charged offense: "The least degree of similarity

12

(between the uncharged act and the charged offense) is required in order to prove intent. . . . '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act. . . .' . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance."''" (*Id*. at p. 402, citations omitted; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1244 ["the doctrine of chances teaches that the more often one does something, the more likely that something was intended, . . . rather than accidental or spontaneous"].)

With these principles in mind, we conclude the trial court did not abuse its discretion by admitting evidence of the 2003 attempted attack on defendant's niece as relevant to defendant's intent under section 1101(b). There was no dispute that defendant stabbed Demariya. Rather, the key issue was whether defendant did so in self-defense (and accidentally, to the extent her action in self-defense was directed at Rembert), as she claimed. Evidence of a prior incident in which defendant attempted to attack a younger, female relative with a knife in the course of an argument was probative on that issue. (See *Ewoldt, supra,* 7 Cal.4th at p. 404.) As noted by the trial court, defendant's conduct during the 2003 incident was remarkably similar to the conduct charged here. In each instance, there was evidence that defendant became angry during an argument and attempted to attack a younger, female relative with a kitchen knife. Thus, the 2003 incident was relevant to the jury's determination of whether defendant possessed the requisite general criminal intent when she stabbed Demariya, and whether the stabbing was the result of defendant's reasonable belief that she needed to defend herself. Therefore, the evidence of the 2003 incident was admissible under section 1101(b).

Defendant asserts the entire focus of the People's argument for admission (and the trial court's subsequent analysis) centered around defendant's purported pattern of violent confrontation followed by a claim of self-defense. Because the 2003 incident did not actually include a claim of self-defense, defendant argues that the remaining similarities

between the two incidents were too weak and generic to support admission and were only relevant to show defendant's propensity for violence. We disagree. As discussed above, defendant's conduct during the incident in 2003 was similar in several aspects to her conduct in the current case, even without any parallel claim of self-defense. Although the prosecutor initially lumped all three prior acts into the purported "pattern of extremely violent and assaultive conduct by the defendant followed by a claim of self-defense," he later conceded there was no self-defense claim after the 2003 incident and the trial court ultimately admitted the incident based on the other similarities in defendant's conduct.

Moreover, the two incidents need not be "particularly distinctive" in order to admit the prior incident under section 1101(b). Rather, they need only be "'sufficiently similar [to the charged offenses] to support the inference that the defendant "probably harbored the same intent in each instance."'" (*People v. Lewis* (2001) 25 Cal.4th 610, 636-637 [finding incidents that are "not particularly distinctive" sufficiently similar to warrant admission and outweigh any prejudice].) "'[W]hen the other crime evidence is admitted solely for its relevance to the defendant's intent, a distinctive similarity between the two crimes is often unnecessary for the other crime to be relevant. Rather, if the other crime sheds great light on the defendant's intent at the time he committed that offense it may lead to a logical inference of his intent at the time he committed the charged offense if the circumstances of the two crimes are substantially similar even though not distinctive.' [Citation.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 16-17.) Here, the 2003 incident easily meets this threshold.

We also conclude the trial court properly weighed the probative value of the evidence against its possible prejudicial effects, pursuant to the requirements of section 352. In addition to the similarity of the prior act to the current offense, the probative value of evidence of uncharged misconduct also is strengthened when, as here, "its source is independent of the evidence of the charged offense." (*Ewoldt, supra*, 7 Cal. 4th at p. 404.)

On the other side, the factors affecting the prejudicial effect of an uncharged act include whether the uncharged act resulted in a criminal conviction and whether the

14

evidence of the uncharged act is stronger or more inflammatory than the evidence of the charged offense. (*Ewoldt, supra*, 7 Cal.4th at pp. 404-405; *People v. Balcom* (1994) 7 Cal.4th 414, 427; *People v. Falsetta* (1999) 21 Cal.4th 903, 917.) While the 2003 incident did not result in a conviction, that fact is tempered by the consideration that evidence of defendant's confrontation with her niece in 2003 was no more inflammatory (and was presented much more briefly) than the evidence regarding her confrontation with her son and ultimate stabbing of her daughter. Moreover, any prejudice from the admission of the 2003 incident was further mitigated by the court's instruction that the evidence could only be considered for the limited purposes permissible under section 1101(b), including intent, mistake or accident, and self-defense. We presume the jurors understood and followed this instruction. (*People v. Harris* (1994) 9 Cal.4th 407, 426.)

Accordingly, the court's conclusion that the probative value of the 2003 incident outweighed the possibility of undue prejudice was not an abuse of discretion.

D.      *Trial Court Erred in Admitting 2009 Incident*

Unlike the 2003 incident, the court's admission of the 2009 incident, in which defendant threw a pot at her boyfriend, was based on the representation by the prosecution that defendant made a claim of self-defense in the 2009 case. Because the People failed to present any evidence of a self-defense claim in 2009, defendant contends evidence of that incident should not have been admitted. We agree.

The trial court admitted evidence of the 2009 incident under section 1101(b) as relevant to defendant's intent and also as evidence of prior domestic violence under section 1109. It is clear, based on the discussions on the record, that the court concluded the prior incident was admissible under section 1101(b) only because of the purported pattern of claims of self-defense. Without that similarity, the court indicated it would likely have excluded the evidence. We agree. As the trial court noted, the chief similarity between the two incidents was defendant's claim of self-defense. Unlike the 2003 incident, defendant's precipitating conduct in 2009 of throwing a flower pot at her boyfriend was not substantially similar to the instant assault. As no evidence was

15

presented at trial of a self-defense claim in 2009, the incident lacked the requisite similarity and should not have been admitted under section 1101(b).

The Attorney General counters that the 2009 incident was nevertheless admissible under section 1109 as evidence of prior domestic violence. Under section 1109, evidence of a defendant's prior domestic violence toward a romantic partner is admissible to show her propensity to commit domestic violence upon her child. (See *People v. Dallas* (2008) 165 Cal.App.4th 940, 953.) Section 1109, subsection (d)(3) allows an expanded definition of "domestic violence" under Family Code section 6211, which includes violence against the child of a party, but specifies that the use of this definition must be "[s]ubject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time."

Here, there is no indication in the record that the trial court reweighed the admissibility of the 2009 incident under section 1109 after the prosecution failed to present evidence that defendant claimed self-defense against her boyfriend. The trial court's initial section 352 analysis, used to admit the evidence under section 1101(b), was based on an alleged self-defense claim that proved to be unsupported by the evidence at trial. Thus, the absence of a "pattern" of self-defense claims undermined the court's rationale for determining that the 2009 incident was sufficiently similar to the instant offense to be admissible under section 352. (See *People v. Johnson*, *supra*, 185 Cal.App.4th at p. 532 ["Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' [Citation]"]; *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 ["'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.'"].)

On the other hand, it is possible that the trial court performed the requisite balancing under section 352 as required by section 1109, and concluded that the 2009 incident was admissible as domestic violence evidence. However, there is nothing in the record to indicate that this was done. The only discussion on the record on this issue

16

following testimony regarding the 2009 incident concerned whether defendant's prior domestic violence upon a boyfriend could be used to show her propensity to commit domestic violence upon her child. While the trial court "'need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation],'" the record must at least "'affirmatively demonstrate that the court did so.' [Citation.]" (*People v. Hollie*, *supra*, 180 Cal.App.4th at p. 1275.) In the absence of any evidence suggesting that the court, armed with the accurate facts of the 2009 incident, performed its duty to balance probative value and prejudice, we conclude that its admission of the 2009 incident under section 1109 was error.[10]

### E.      *Error Was Harmless*

Although we conclude that the evidence of the 2009 incident was erroneously admitted, we find the error was harmless. We review a court's erroneous admission of prior misconduct evidence under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, requiring reversal only if there is a reasonable probability that the defendant would have obtained a more favorable result absent the error. (See, e.g., *People v. Malone* (1988) 47 Cal.3d 1, 22.)

Under the circumstances of this case, we conclude a different result was not reasonably probable absent the admission of the 2009 incident involving defendant's boyfriend. In particular, the jury would still have been able to consider evidence of the properly-admitted 2003 incident involving defendant's niece as relevant to defendant's intent and self-defense claim. And the 2009 incident, in which defendant threw a pot at her boyfriend with no resulting injury, was less inflammatory than either the 2003 incident or the current charge, both of which involved defendant's use of a knife against much younger victims. Moreover, Martin, the victim in the 2009 incident, significantly downplayed the attack at trial.

---

[10] Defendant appears to suggest on appeal that the trial court was obligated by the language in 1109, subsection (d)(3) to expressly consider the factors of corroboration and remoteness during its analysis under section 352. We need not decide this issue in light of our conclusion that incident was erroneously admitted.

In addition, the evidence for the current charge that defendant stabbed her daughter during an argument was undisputed, while the evidence in support of defendant's self-defense claim was weak. Neither Demariya nor Rembert mentioned any facts suggesting self-defense or an accidental stabbing in their initial statements following the incident. Instead, both consistently claimed that defendant approached Demariya and then stabbed her. And even under the version of events offered by Demariya at trial—the account most favorable to defendant—the evidence suggested that defendant left the room where she was arguing with Rembert, retrieved a knife from another room, and returned armed with the knife. As such, it is not reasonably likely that the jury would have credited defendant's claim of self-defense if the 2009 incident had been excluded.

Defendant contends the prejudicial effect of the admission of the 2009 incident was heightened by the prosecutor's comment during closing argument that the jury could use the 2009 incident "to say, gosh, what are the chances that she's going to be claiming self-defense here, especially given the fact that she told the officer that she was acting in self-defense on that case." This argument by the prosecutor undisputedly misstated the evidence.[11] However, the prosecutor made no further reference to the purported 2009 self-defense claim,[12] and the jury was properly instructed to regard the remarks of counsel as argument, not evidence. The evidence presented at trial regarding the incident clearly contained no mention of self-defense. Under these circumstances and in light of the strength of the remaining evidence, discussed above, we conclude that the single misstatement by the prosecutor did not tip the balance into prejudicial error.[13]

---

[11] We note that defendant did not object to this statement at trial and does not raise a claim of prosecutorial misconduct on appeal.

[12] We reject defendant's claim that the prosecutor also improperly argued that the 2003 incident could be used for propensity as unsupported by the record. The prosecutor merely stated that the 2003 evidence was relevant to evaluate defendant's current self-defense claim, which was appropriate pursuant to section 1101(b), as discussed above.

[13] For the same reasons, we reject defendant's contention that the admission of these prior acts rose to the level of a due process violation of his constitutional rights. (See, e.g., *People v. Falsetta, supra*, 21 Cal.4th 903.)

18

**DISPOSITION**

Affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, Acting P. J.


MANELLA, J.