Filed 8/15/23  P. v. Ramirez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE RAMIREZ,<br><br>    Defendant and Appellant. | D079970<br><br><br><br>(Super. Ct. No.  SCN422740) |

APPEAL from a judgment of the Superior Court of San Diego County, David L. Berry, Judge.  Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

In case No. SCN422740, a jury convicted Jose Ramirez of arson of an inhabited structure or property (Pen. Code,[1] § 451, subd. (b); count 1); and two counts of animal abuse and neglect (§ 597, subd. (b); counts 2 and 3). In addition, Ramirez admitted that he committed the three offenses while released from custody on bail (§ 12022.1, subd. (b)).

The court sentenced Ramirez to prison for a total of eight years four months.[2]

Ramirez appeals, contending (1) the trial court improperly instructed the jury regarding the mental state for arson; (2) the court abused its discretion by admitting evidence of prior acts of domestic violence; (3) his Sixth Amendment right to confront witnesses was violated because the court allowed a witness to testify with a surgical mask that obscured her face; and (4) cumulative error warrants reversal. We conclude none of Ramirez's arguments have merit. Thus, we affirm the judgment.

FACTUAL BACKGROUND

*Prosecution*

K.E. and her three children, ages 15, eight and six, lived in a four bedroom mobile home in Escondido. She also had two cats. K.E. kept a desk that she used as a religious altar in one of the bedrooms in her home. K.E. referred to that room as her office. K.E.'s altar contained candles, statues, flowers, beads, oils, and incense.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     Ramirez's prison sentence was based on his convictions in case No. SCN422740 as well as him pleading guilty to one count of transportation of heroin (Health & Saf. Code, § 11352, subd. (a)) in case No. SCN414777. Because the instant appeal does not concern case No. SCN414777, we do not discuss that case any further.

2

K.E. was in a romantic relationship with Ramirez, whom she had known for about a year. They both used drugs, including methamphetamine. Additionally, K.E. suffered from borderline personality disorder, causing her, at times, to be volatile and emotional.

The morning of April 1, 2021, around 9:00 a.m., K.E. and Ramirez, along with two of Ramirez's friends, went to a recycling center to exchange cans for money. K.E. then went to run errands with a friend while Ramirez remained at her home. When K.E. returned home from running errands, she and Ramirez were "bickering" and "not getting along." They were arguing about money and it got "nasty." Ramirez repeatedly said to K.E., "I'll show you, I'll show you."

Later that afternoon, K.E. called Ramirez's mother, and said she and Ramirez were in an argument and Ramirez was threatening to burn K.E.'s house down. K.E. asked Ramirez's mother to come pick up Ramirez. When Ramirez's mother arrived, the house was burning.

K.E. told law enforcement officers that she called Ramirez's mother because, "[Ramirez] was acting so crazy." K.E. said that Ramirez came out of her office with a torch lighter in his hand. He walked past her and said, "[K.E.], your room's on fire, 'like all creepy,' 'proud of yourself?'" K.E. said she began running around trying to save her cats, but they both died in the fire. Ramirez did not help K.E.; he "just bolted."

K.E. told officers that Ramirez set fire to her altar table with a torch lighter to try to kill her. The jury saw video of K.E. telling officers, "[Ramirez] did it. He set my room on fire. I wouldn't let him have my car, he set my room on fire. He goes, 'I'll show you.' Oh, my babies!" K.E. continued, "I saw him set my room on fire. Because I wouldn't give him the goddamn

3

couple hundred dollars from Recycling . . . ." K.E. said Ramirez started the fire "with a fuckin' torch—with a torch fuckin' lighter . . . ."

K.E. told officers, "He lit like the—there was like some candles and stuff that I had that had like oil and stuff in them. He fuckin lit that like all of it and my bookshelf. And I went to go get the hose."[3]

The jury heard K.E.'s statement made to responding officers about two prior acts of domestic violence. K.E. told police that "recently" Ramirez told her he would "kick me in the face if I didn't like give him all my money and I handed him my money." In addition, K.E. informed the police that Ramirez broke the windshield of the car she was driving.

*Defense*

A defense investigator testified that he interviewed K.E. on June 15, 2021. She told him that her prior statements to law enforcement were influenced by her emotions and that she lied to the police officers because she was angry with Ramirez. Thus, Ramirez did not actually start the fire.

DISCUSSION

I

ARSON JURY INSTRUCTION

A.  Ramirez's Contentions

Ramirez argues that the trial court improperly instructed the jury on the crime of arson. Relying on *In re V.V.* (2011) 51 Cal.4th 1020 (*V.V.*), he claims the court "misdirected the jury on the malicious mental state element, because it failed to instruct that malicious requires 'aware[ness] of facts that would lead a reasonable person to realize that the direct, natural, and highly

---

[3]  At trial, K.E. testified that she was emotional and initially thought that Ramirez set the fire. However, she did not see him start the fire. She claimed that she saw him light the altar on fire because she believed he did it at the time, and she did not want him to get away with it.

4

probable consequence of' an act would be a proscribed fire." (*Id* at p. 1031.) We disagree.

### B. Background

Ramirez's trial counsel agreed the court should instruct the jury with CALCRIM No. 1502. The trial court asked counsel if he also wanted to include a definition of the required mental state for arson in CALCRIM No. 251, but counsel replied that he preferred the court provide the jury with the mental state as defined in CALCRIM No. 1502 and not "muddy the waters having it in there a couple times." At the conclusion of the discussion of jury instructions, the court clarified that CALCRIM No. "1502 is the instruction on arson. As to arson, it appears to be correct. Anything else on the proposed arson instruction, [defense counsel]?" Counsel replied in the negative.

The trial court instructed the jury with CALCRIM No. 1502, in pertinent part, as follows:

> "The defendant is charged in Count One with arson that burned an inhabited structure in violation of Penal Code section 451(b).

> "To prove that the defendant is guilty of this crime, the People must prove that:

> "1. The defendant set fire to or burned or caused the burning of a structure;

> "2. He acted willfully and maliciously;

> "AND

> "3. The fire burned an inhabited structure.

> "To *set fire to or burn* means to damage or destroy with fire either all or part of something, no matter how small the part.

5

"Someone commits an act *willfully* when he or she does it willingly or on purpose.

"Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to defraud, annoy, or injure someone else.

The trial court also instructed the jury per CALCRIM No. 1531 (Unlawfully Causing a Fire:  Inhabited Structure (Pen. Code, § 452)).  That instruction is substantially similar to CALCRIM No. 1502, except for the mens rea element, which is not willfully and maliciously but recklessly.  As such, to be guilty under section 452, a jury would have to find that a defendant acted "recklessly" in setting fire to, burning, or causing to burn a structure.  Moreover, CALCRIM No. 1531 describes recklessly as follows:  "A person acts recklessly when (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of causing a fire, (2) he or she ignores that risk, and (3) ignoring that risk is a gross deviation from what a reasonable person would have done in the same situation."

During closing argument, the prosecutor emphasized that he had "to prove it was [Ramirez's] actions that was coupled with him acting maliciously that caused the fire."  The prosecutor then explained maliciously:

"So what does 'maliciously' mean?  There are two avenues to get to the standard of maliciousness.  'Maliciously' means either intentionally doing a wrongful act or acting with an unlawful intent to defraud annoy or injure someone.  I think of two in my mind just acting like a jerk.  You're either doing something, acting like a jerk and something horrible like this happens, you're held accountable.  You're also held accountable if you're intentionally burning down a house.  That would be something that is wrongful.  I think there's evidence to support both of these avenues."

"But I want to be clear.  Even if you find that he was just poured in oil and was goofing off in front of [K.E.], trying to scare the daylights out of her because he's doing this with

6

his lighter intentionally and the house goes up, because he was acting like a jerk, he's held accountable and it's considered malice and his guilty of count 1."

The prosecutor also addressed the difference between malice and recklessness. Therefore, he told the jury:

"Recklessness is you are aware of you're at high risk of causing a fire and you don't consider that risk. I consider that label that as you being a bone head. Different than being a jerk. You're just doing something stupid.

"What does that typically look like? This looks like the guy who goes up to the wood on a windy day and ignores the signs and just starts making that huge bonfire and some embers take off and burn down the forest. Because he's not acting like a jerk. He's not doing this to harm or annoy anybody. He's being a bone head. He's not held to a malice standard. He's just acting recklessly. So he would be guilty of unlawfully causing a fire as opposed to arson.

"So was [Ramirez] acting recklessly? This is where you have to be careful. The answer is yes. But also, he was acting maliciously, okay? So you would say, well, would pouring oil on a table and a floor and lighting it on fire, isn't he aware that would cause a risk or there are risks of causing a fire? Yes. And did he ignore that by doing that? Yes. So isn't he acting recklessly? Yes. He's acting recklessly. But not just recklessly, he's acting with malice. And that's exactly why the law – the instructions tell you to review the greater crime first, then the lower crime. Because this is the exact same crime, except you need to determine whether he was acting with malice or recklessness, okay?"

During his closing argument, Ramirez's trial counsel primarily argued that the prosecution had not proved that Ramirez started the fire at the altar. However, defense counsel did briefly discuss the mens rea for arson. To this end, he stated:

"Arson, which is charged in Count 1 as [CALRIM No.] 1502, requires the mental state that somebody willfully and maliciously did something. That is the thought, the mindset that has to be present. I'm not going to read through that. I just want the point out so that there's no confusion in explaining what we mean by this is the mental state. This applies to willfully and maliciously to the arson charge.

"Now, there's a second charge that's related to arson, and that is going to be CALCRIM 1531 where reckless is the mental state. For my purposes, it's just noteworthy that it's different than the first one, maliciously and willful."

## C. Analysis

Below, Ramirez's trial counsel agreed with providing the jury with CALCRIM No. 1502 and did not request any other instruction regarding the required intent to prove arson. Yet, on appeal, Ramirez now argues the trial court prejudicially erred because it did not correctly instruct the jury as to the "malicious mental state element" of arson. Because he failed to object to or request a specific jury instruction at trial, the People contend that Ramirez forfeited his claim on appeal. However, Ramirez argues that forfeiture is not applicable here because the claimed error affected Ramirez's substantial rights. (See § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Therefore, he argues we must first analyze the merits of his claim to determine if a substantial right is implicated before considering forfeiture. We agree with that principle. In addition, although the People argue otherwise, it appears that Ramirez essentially contends the

8

instruction incorrectly stated the law in that it "misdirected the jury on the malicious mental state element." Such a claim would be preserved on appeal despite a failure to object below. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) In any event, we shall address the merits of Ramirez's claim of instructional error as a threshold matter.

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid*.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid*.) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

A person is guilty of arson when he or she "willfully and maliciously" sets fire to any structure or property. (§ 451.) The term "willfully" means with a purpose or willingness to commit the act; it does not require any intent to violate the law, injure another, or acquire any advantage. (*V.V., supra*, 51 Cal.4th at p. 1027.)

The term "maliciously" refers to either "[m]alice in fact" or "[m]alice in law." (*V.V., supra*, 51 Cal.4th at p. 1028.) "Malice in fact" means actual ill will or intent to injure. (*Ibid*.) "Malice in law" means an intent to do a wrongful act, established either by proof or presumption of law. (*Ibid*.) For

9

arson, malice in law will be presumed or implied from the deliberate and intentional ignition or act of setting a fire without a legal justification, excuse, or claim of right.  (*Ibid.*)

The "willful and malice" requirement for arson "ensures that the setting of the fire must be a deliberate and intentional act, as distinguished from an accidental or unintentional ignition or act of setting a fire; ' "in short, a fire of incendiary origin." ' " (*People v. Atkins* (2001) 25 Cal.4th 76, 88 (*Atkins*); see *V.V.*, *supra*, 51 Cal.4th at p. 1029.)  However, arson is a general intent crime; the specific intent to burn the relevant structure or property is not required.  (*V.V.*, at p. 1027; *Atkins*, at p. 84.)  Rather, it is sufficient to prove malice by showing that a defendant possesses "a general intent to willfully commit an act of setting on fire under such circumstances that the direct, natural, and highly probable consequences would be the burning of the relevant structure or property."  (*V.V.*, at p. 1029.)

In *V.V.*, *supra*, 51 Cal.4th 1020, a minor lit a large firecracker, which was then thrown by another minor onto a brush-covered hillside.  (*Id.* at p. 1024.)  The firecracker exploded, causing a brush fire.  (*Ibid.*)  Our high court concluded that substantial evidence supported the juvenile court's finding that the minors committed arson of forest land (§ 451, subd. (c)).  (*V.V.*, at pp. 1026-1033.)  It mattered not that the minors "did not intend to set the hillside on fire and tried to avoid such a consequence."  (*Id.* at p. 1030.)  The Supreme Court concluded that "[a] defendant may be guilty of arson if he or she acts with awareness of facts that would lead a reasonable person to realize that the direct, natural, and highly probable consequence of igniting and throwing a firecracker into dry brush would be the burning of the hillside" and that minors "were aware of such facts."  (*Ibid.*)

10

Here, Ramirez argues that the arson instruction given by the trial court was erroneous because it failed to provide "a technical description of the malice element of arson," which is set forth in *V.V.*, *supra*, 51 Cal.4th 1020. Therefore, relying on *V.V.* at page 1030, Ramirez asserts that CALCRIM No. 1502 did not correctly instruct the jury regarding malice because "it did not require a reasonable person to be aware that a structure fire was a 'direct, natural, and highly probably consequence[ ]' of his actions." We disagree.

The applicable arson statute does not include the "direct, natural and highly probable consequence" language Ramirez deems essential. Rather, section 451 states that "[a] person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property."

CALCRIM No. 1502, as given by the trial court here, tracked the statutory language and included all elements of the offense by instructing that the prosecution was required to prove that (1) "defendant set fire to or burned or caused the burning of a structure or property;" and (2) defendant "acted willfully and maliciously." In addition, the instruction provided correct definitions of "willfully and maliciously." It explained that "[s]omeone commits an act willfully when he or she does it willingly or on purpose." This comports with the statutory definition that " 'willfully,' when applied to the intent with which an act is done . . . , implies simply a purpose or willingness to commit the act[.]" (§ 7, subd. (1).) The instruction also explained that "[s]omeone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to defraud, annoy, or injure someone else." This is consistent with the statutory definition that " '[m]aliciously' imports a wish to vex, defraud, annoy, or injure another

11

person, or an intent to do a wrongful act[.]"  (§ 450, subd. (e); see § 7, subd. (4).)

Our high court in *V.V.*, *supra*, 51 Cal.4th 1020 did not add an element to the crime of arson or find the statutory definitions of willfully and maliciously inapplicable.  Instead, it explained that the element of malice can take two forms—malice in fact and malice in law.  (*Id.* at p. 1028.)  As we discussed *ante*, Malice in fact is " 'a wish to vex, annoy, or injure' [citation]—consist[ing] of actual ill will or intent to injure"—while malice in law is " 'an intent to do a wrongful act . . . [,]' " which "may be 'presumed' or 'implied' from the intentional doing of the act without justification or excuse or mitigating circumstances."  (*Ibid.*)  In the specific case of arson, malice in law "will be presumed or implied from the deliberate and intentional ignition or act of setting a fire without a legal justification, excuse, or claim of right."  (*Ibid.*)

In *Atkins*, *supra*, 25 Cal.4th 76, the Supreme Court had previously held that arson requires only "a general intent to willfully commit the act of setting on fire under such circumstances that the direct, natural, and highly probable consequences would be the burning of the relevant structure or property."  (*Id.* at p. 89.)  In *V.V.*, *supra*, 51 Cal.4th 1020, the Supreme Court stated that the phrase " ' . . . *under such circumstances that the direct, natural, and highly probable consequences would be the burning of the relevant structure or property*[ ]' " "describes arson's malice requirement, i.e., that the willful and intentional act is committed under circumstances that create an obvious fire hazard."  (*Id.* at p. 1031, fn. 6.)

The language regarding a direct, natural, and highly probable consequence does not add an element to the crime of arson but rather provides an amplification of the statutory definition of malice conveyed in the

12

instruction given to the jury at Ramirez's trial. Because the trial court's instruction was an accurate statement of the law, conforming to the statutory language, the court had no sua sponte duty to instruct on the amplification of the malice requirement provided in *V.V.* and *Atkins.* (*People v. Turner* (2019) 37 Cal.App.5th 882, 887-888.) Ramirez's failure to ask for " ' " . . . additional, amplified, explanatory, fuller, or more complete, elaborate, comprehensive, definite, specific or explicit instructions . . . [ ]" ' " forfeited his claim of error on appeal. (*Id.* at p. 888; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1223 [where jury instruction was legally correct, the "defendant's failure to propose any modification to the instruction forfeit[ed] the claim of instructional error"].)

II

PRIOR BAD ACTS EVIDENCE

A. Ramirez's Contentions

Ramirez maintains that the trial court abused its discretion in admitting two prior acts of domestic violence, arguing the prior uncharged acts were not probative and were likely to confuse or mislead the jury. We disagree.

B. Background

The prosecution sought to introduce three prior acts of domestic violence: (1) Ramirez threatened to kick K.E. in the face if she did not give him money; (2) Ramirez smashed the windshield of K.E.'s car; and (3) in 2014, Ramirez was involved in an incident of domestic violence with another individual. The court ruled that the two incidents involving K.E. were admissible under Evidence Code section 1109, explaining that one purpose of admitting prior acts of domestic violence is to show escalating violence, and the two subject events indicated a "spiral" in the relationship. Moreover, the

13

court underscored that the incidents were relevant because at least one of them stemmed from an argument about money, and Ramirez and K.E. were arguing about money when Ramirez set fire to K.E.'s home. Additionally, the court determined that the incidents were not "necessarily prejudicial" and that their admission would not consume "a lot of time." However, the court excluded evidence of the 2014 incident under Evidence Code section 352.

At trial, the prosecution offered evidence of a picture of K.E.'s car with a broken windshield. The court admitted the evidence. In addition, the prosecution played a recording of K.E. wherein she told the police that "recently" Ramirez told her he would "kick me in the face if I didn't . . . give him all my money and I handed him my money," and that "he did break the windshield of the car I was driving."

The trial court properly instructed the jury regarding how to use the prior bad acts of evidence.

During closing argument, the prosecutor referred to K.E. as a victim of domestic violence.

### C. Analysis

"Ordinarily, propensity evidence—evidence that a defendant committed an uncharged offense—is inadmissible to prove the defendant's disposition to commit the charged offense. ([Evid. Code,] § 1101, subd. (a).) Evidence that the defendant committed uncharged crimes or other acts, however, is admissible to prove relevant facts other than disposition, such as motive, intent, and absence of mistake or accident. ([Evid. Code,] § 1101, subd. (b).)" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 531 (*Kerley*).) Evidence Code section 1109 is yet another legislative carveout to this general rule against admitting propensity evidence and provides an exception in domestic violence cases. It states: "[I]n a criminal action in which the defendant is accused of

14

an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352." (Evid. Code, § 1109, subd. (a)(1).) "As a result, [Evidence Code] section 1109 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.' " (*Kerley*, at p. 531.)

"[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420.) Evidence Code section 1109 thus " 'reflects the legislative judgment that in domestic violence cases . . . similar prior offenses are "uniquely probative" of guilt in a later accusation.' " (*Kerley*, *supra*, 23 Cal.App.5th at p. 531.)

Under Evidence Code section 352, the court must first determine whether the "probative value [of the evidence is] substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, §§ 352, 1109.) The trial judge is in the best position to evaluate the evidence. (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966 (*Hernandez*).)

"We review a challenge to a trial court's decision to admit [this] evidence for abuse of discretion." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*).) "A trial court's exercise of its discretion under [Evidence Code] section 352 ' "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently

15

absurd manner that resulted in a manifest miscarriage of justice.' ' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.)

In applying Evidence Code section 352, " 'prejudicial' " is not synonymous with " ' "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  Rather, evidence is unduly prejudicial under Evidence Code section 352 only if it "uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues" (*Karis*, at p. 638), or if it invites the jury to prejudge " 'a person or cause on the basis of extraneous factors.' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.)  "Painting a person faithfully is not, of itself, unfair." (*Ibid.*; *Johnson*, *supra*, 185 Cal.App.4th at p. 534.)

Here, Ramirez argues that his threat to kick K.E. and the damaging of K.E.'s car window were not probative because they lacked the frequency, regularity, and severity of the uncharged domestic violence offenses in *Kerley*, *supra*, 23 Cal.App.5th at pages 534 through 536.  We reject this contention.

" 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274; *Hernandez*, *supra*, 200 Cal.App.4th at p. 966 [a significant factor in determining the probative value of the evidence is " 'whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense' "].) "[P]roponents of the bill that became [Evidence Code] section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence," a "pattern" that "suggests a psychological dynamic not necessarily involved in other types of crimes." (*Johnson*, *supra*, 185 Cal.App.4th at p. 532.)

16

Thus, the probative value of a defendant's uncharged abusive acts arises primarily from the similarity between the uncharged act and the charged conduct. The repetition of similar abusive behavior suggests the defendant has a pattern of engaging in particular forms of domestic violence under particular circumstances. For example, in *Johnson, supra,* 185 Cal.App.4th 520, an attempted murder case in which the defendant was alleged to have shot his girlfriend, the Court of Appeal determined that the trial court properly admitted evidence of two prior instances in which the defendant had shot other girlfriends. (*Id.* at pp. 532-533.) Although the shootings occurred more than 10 years before the charged crime, their probative value was great because they demonstrated a pattern of the defendant using guns against his domestic partners to exact revenge when he felt rejected by them. (*Ibid.*)

In the instant action, Ramirez's two acts of domestic violence within a year of the charged offenses revealed a behavior pattern consistent with his setting fire to K.E.'s home. Regarding the first act of domestic violence, Ramirez threatened to kick K.E. in the face if she did not give him money. Before Ramirez committed arson, he and K.E. were in an argument about money, and he warned her, "I'll show you, I'll show you." Further, Ramirez was willing to destroy K.E.'s property as he damaged her car windshield and then later set fire to her home. Therefore, contrary to Ramirez's arguments here and below, we agree with the trial court that these two previous acts of domestic violence were probative of Ramirez's escalating violence toward K.E.

Ramirez's reliance on *Kerley* does not persuade us to conclude otherwise. That case involved facts and issues quite different from those presented here. In *Kerley*, the defendant was accused of murdering his

17

girlfriend. She went missing, and her decomposed body was discovered and identified more than a decade later. (*Kerley*, *supra*, 23 Cal.App.5th at pp. 521-526.) The cause of death, including whether it had resulted from an assaultive act, was disputed, and revolved around competing expert interpretations of fractures in the ribcage of the deceased victim. (*Id*. at pp. 525-527.)

During the prosecution's case-in-chief, "[t]he jurors learned that, over a period of 10 years, Kerley regularly punched and kicked [the decedent], slapped her, threw her to the ground when she was pregnant, punched and kicked her in the stomach when she was pregnant, restrained her from leaving the home, stalked her, beat her in the back with a two-by-four, kicked her in the eye, mopped the floor with her face and hair, stomped on her hand and foot, and repeatedly threatened to kill her." (*Kerley*, *supra*, 23 Cal.App.5th at p. 540.) The appellate court concluded the trial court did not err by admitting this evidence under Evidence Code section 1109. (*Kerley*, at pp. 539-540.) It reasoned that evidence of Kerley's prior assaults was "directly relevant" because "the fact that [he] regularly assaulted the victim is evidence the jury can use to conclude, along with other evidence, that [he] assaulted the victim in committing the charged crime." (*Id*. at p. 539.)

Rejecting Kerley's argument that the evidence was inflammatory and prejudicial under Evidence Code section 352, the appellate court reasoned that Kerley's behavior represented "compelling evidence" of his propensity to beat his partner, that "[t]he frequency and regularity with which Kerley beat [the decedent] provided vivid proof he would likely beat [her] again," and that "[t]he severity and viciousness with which [Kerley] assaulted [the decedent] was probative of the intensity and depth of his willingness to harm her." (*Kerley*, *supra*, 23 Cal.App.5th at p. 540.) The court explained, "this type of

18

'prejudice' is not the 'prejudice' envisioned by [Evidence Code] section 352." (*Ibid.*)

Returning to the case at hand, Ramirez argues that his acts of domestic violence were not probative because they were not as frequent, regular, or severe as in *Kerley*. This comparison misses the point. That particularly egregious acts of violence were admitted in *Kerley* does not, on its own, establish a general rule requiring evidence of domestic violence to be just as egregious to be admissible in other cases. The probative value of a defendant's prior domestic violence incidents comes from the defendant's tendency to engage in a particular pattern of abuse. The probative value of this evidence is in the similarity of defendant's later conduct to his own earlier behavior, not the similarity of the defendant's abusive acts to those of another defendant, particularly another defendant accused of a dissimilar offense. Ramirez, unlike the defendant in *Kerley*, was not on trial for murdering his partner by crushing her ribcage. Ramirez's uncharged misconduct did not need to be similar in kind or frequency to the uncharged acts admitted in *Kerley* to be probative here.

Next, Ramirez claims that his prior acts of domestic violence were not probative because of a lack of corroboration. Thus, he contends those acts lacked probative value because K.E. was the only source of information for both acts, and the prosecution did not establish how much time passed between the prior acts and the arson. These arguments lack merit.

At the outset, Evidence Code section 1109 does not mandate corroboration. The relevant part of the statute states: "Subject to a hearing conducted pursuant to [Evidence Code] Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if

19

the act occurred no more than five years before the charged offense." (§ 1109, subd. (d)(3).) "Consideration of a factor such as corroboration does not mandate the existence of that factor." (*People v. Mani* (2022) 74 Cal.App.5th 343, 373.) Thus, under Evidence Code section 1109, "corroboration is not a requirement." (*Mani*, at p. 372.) Accordingly, the fact that K.E. was the only source of information regarding the prior acts did not render evidence of those acts inadmissible at trial.

Moreover, Ramirez's argument regarding the timing of the two prior bad acts is similarly unpersuasive. Evidence Code section 1109, subdivision (e) limits the admission of prior bad acts that occurred more than 10 years before the charged offense unless "the court determines that the admission of this evidence is in the interest of justice." Here, it is undisputed that the prior acts occurred within a year of the charged offense because K.E. had only known Ramirez for about a year. Therefore, the fact that the prosecution did not prove precisely when the two prior acts occurred is insignificant to our analysis here.

Additionally, Ramirez, in rather cursory fashion, asserts that the jury may have felt compelled to punish him for the prior bad acts because those acts did not result in any previous criminal convictions. This argument is pure speculation. Further, Ramirez concedes that the trial court correctly instructed the jury in the proper use and consideration of the prior bad acts evidence. And we must presume that the jury followed the court's instructions. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1234.)

Finally, we disagree with Ramirez's final argument that the evidence of the prior acts of domestic violence distracted and confused the jury. The admission of those acts took very little time at trial, constituted minute evidence against Ramirez, and did not require the testimony of additional

witnesses.  On this record, we cannot contemplate how the evidence of prior acts of domestic violence confused or distracted the jury.  Also, the acts were far less inflammatory than the charged offenses against Ramirez.

In short, against this backdrop, we conclude the trial court did not abuse its discretion in admitting the prior acts of domestic violence under Evidence Code sections 1109 and 352.

## III

## WEARING OF A SURGICAL MASK WHILE TESTIFYING

### A.  Ramirez's Contentions

Ramirez maintains that his Sixth Amendment right to confront witnesses was violated when the trial court allowed K.E. to testify while wearing a surgical mask instead of a clear, plastic mask (referred to as a "ghost shield" in the record).  We disagree.

### B.  Background

Ramirez's trial occurred during the COVID-19 pandemic.  As such, it was conducted under various emergency orders and a mask mandate.  Before the first witness testified, the court broached the subject of witnesses wearing masks.  In doing so, the court noted that the prosecution had "come up with what's called a ghost mask, which is a plastic shield that goes on the nose of the individual."  It further explained that it found it acceptable if K.E. was willing to wear the ghost mask.

Ramirez's trial counsel indicated that, although he preferred "any witness in this trial be subject to full scrutiny and that involves the jury's ability to see their facial expressions and demeanor while testifying," he felt "that this mask affords us the closest to a normal ability to observe a witness in non-Covid times as possible, and that would be acceptable to me."  In response, the court indicated that it would not make K.E. wear the ghost

21

mask if she was not willing to wear it. Further, the court stated that K.E. had to wear a mask, and it would allow her to wear whatever mask she wanted. Defense counsel did not object to any other witness wearing a surgical mask.

When K.E. began to testify at trial, she was wearing the ghost mask. Around 45 minutes into K.E.'s testimony, the trial court noted that the ghost mask appeared to be uncomfortable to her. K.E. stated that the ghost mask was "making [her] breathe [her] own oxygen." The court then commented:

> "Let me establish what the record is. She's expressed ghost—the ghost mask does not appear to be comfortable. It has a metal band that closes down on your nose, almost like one of those strips. It does appear to be uncomfortable. She's expressed discomfort. She's trying to hold it in front of her face and still talk. [K.E.] has been on the stand now since approximately 9:15. It's now approximately a few minutes to 10:00."

The trial court then allowed K.E. to testify in a surgical mask that covered her nose and mouth. In doing so, the court noted that "[t]he jury has had an opportunity to see her, watch her face, get a feel for how she speaks. She's clearly in discomfort and not happy with wearing the ghost mask."

Ramirez's trial counsel then noted his objections for the record, incorporating his earlier comments. After which, the court explained:

> "The jury has had an opportunity to be able to observe [K.E.] and her facial expressions. You'll be able to continue to observe her, but I'm not going to make someone continue to be uncomfortable. And, in fact, she's at the point now where she's taking the mask off and it's no longer serving any protect[ive] purposes. It is unfortunate, but the courts are still under emergency orders. The Covid pandemic, although we all wish it ended by now, the emergency orders are still in place and individuals on the inside of enclosed environments are to be wearing facial masks.

22

"Okay. Wear it over your nose, though, please. If you're wearing it, it has to cover everything, including your nose and mouth.

"All right. Thank you. Over the objection of defense, I am going to allow her to wear a surgical mask at this point."

K.E. then finished testifying while wearing a surgical mask.

### C. Analysis

Ramirez argues the trial court violated his Sixth Amendment right to confrontation by allowing K.E. to testify wearing a surgical mask when the clear, ghost mask was available, and she had begun her testimony wearing the ghost mask.[4] We reject this claim, following the trio of cases concluding that trial court orders requiring witnesses to wear face coverings during the early months of the pandemic did not violate the confrontation clause. (*People v. Edwards* (2022) 76 Cal.App.5th 523, 525-527 (*Edwards*); *People v. Lopez* (2022) 75 Cal.App.5th 227, 232-236 (*Lopez*); *People v. Alvarez* (2022) 75 Cal.App.5th 28, 34-39 (*Alvarez*).)

In *Alvarez*, the trial occurred during the COVID-19 pandemic. Before trial, defense counsel expressed his concern that allowing witnesses to wear masks while testifying to protect them from the spread of the virus would violate the defendant's constitutional right to confrontation. The judge who presided over this hearing responded that the witnesses "might be able to drop their masks below their mouths while testifying behind a plastic shield, which had been installed on the witness stand following the COVID-19 outbreak, and return the masks to cover the tip of their nose and mouths

---

[4]    The People argue that Ramirez forfeited this issue by failing to object below. The record does not support the People's position. Ramirez's trial counsel clearly objected to the trial court allowing K.E. to wear a surgical mask while testifying.

when not speaking." (*Alvarez*, *supra*, 75 Cal.App.5th at p. 34.)  However, when a different judge presided over the trial, and defense counsel raised the same concern, requesting that witnesses testify without face masks, the judge required the witnesses to wear masks but allowed them to remove the masks " 'momentarily' " so they could be seen.  (*Ibid*.)

The court determined that a compelling public policy, the protection of the health and safety of the trial participants and members of the public who may attend the trial, justified the trial court's mask requirement.  The court noted requiring individuals while testifying to wear masks covering their mouth and lower part of the nose during the pandemic "served an important state interest in protecting the public from a contagious, and too often, lethal disease." (*Alvarez*, *supra*, 75 Cal.App.5th at p. 36.)  As to less restrictive alternatives, such as face shields and plexiglass screens, the court reasoned, " 'The CDC [(Centers for Disease Control and Prevention)] also makes a distinction between "masks" and "face shields," which is what the Government recommends here.  The CDC finds that face shields are not as effective as masks, and it does not recommend substituting face shields for masks.  [Citation.]  Given the CDC recommendations, which are based on the best available science in this area,' " the court concluded the CDC's " 'social distancing and mask protocols are necessary and essential to protect the courtroom participants during a trial.' " (*Id*. at p. 37.)  Ultimately, the court found "face shields and plexiglass screens are not an adequate substitute and standing alone do not provide reasonable protection for the trial participants." (*Ibid*.)

Finally, the court found all elements inherent in the confrontation clause, as set out in *Maryland v. Craig* (1990) 497 U.S. 836 (*Craig*), were

satisfied.[5]  (*Alvarez*, *supra*, 75 Cal.App.5th at pp. 37-38.)  The witnesses were physically in the courtroom in the presence of the defendant, under oath, and they were subject to "rigorous cross-examination."  (*Id.* at p. 38.)  Even though face masks covered their mouths and the lower part of their noses, the court observed "significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, were readily observable as was posture, tone of voice, cadence and numerous other aspects of demeanor: 'Demeanor includes the language of the entire body [and] jurors will be able to observe most facets of the witnesses' demeanor.' "  (*Ibid.*)

In sum, the court in *Alvarez* concluded that as long as all procedural safeguards for ensuring reliability were present, "despite some minimal limitation on a jury's ability to assess witness demeanor," the confrontation clause was not violated.  (*Alvarez*, *supra*, 75 Cal.App.5th at pp. 38-39.)

Likewise, in *Lopez*, the court held the mask requirement did not violate the defendant's right to confrontation.  There, during pretrial proceedings, the defendant requested to be relieved of the requirement to wear a mask and

---

[5]      In *Craig*, the United States Supreme Court recognized "that face-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person."  (*Craig*, *supra*, 497 U.S. at p. 846.)  The high court, nonetheless, also recognized that "[a]lthough face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' [citation], we have nevertheless recognized that it is not the *sine qua non* of the confrontation right."  (*Id.* at p. 847; accord, *People v. Wilson* (2021) 11 Cal.5th 259, 290.)  Rather, " 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' [citation], a preference that 'must occasionally give way to considerations of public policy and the necessities of the case.' "  (*Craig*, at p. 849.)  Although the "face-to-face confrontation requirement is not absolute," it cannot be "easily dispensed with," and may be denied only when "necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."  (*Id.* at p. 850.)

that all witnesses be allowed to testify without masks.  The trial court denied the defendant's motion.  (*Lopez*, *supra*, 75 Cal.App.5th at p. 231.)  Mirroring the same rationale as in *Alvarez*, the appellate court upheld the trial court's decision requiring the defendant and witnesses to wear masks.  (*Id.* at pp. 232-236.)  Unlike *Alvarez*, however, the defendant in *Lopez* focused on a handful of orders from courts in other counties allowing witnesses during trial to testify maskless.  The appellate court determined the lack of adherence to identical procedures during the pandemic only "underscores the need for deference to a trial court's inherent authority and discretion to control the proceedings before it." (*Lopez*, at p. 235.)  Accordingly, the court declined to adopt a rule infringing on the trial court's inherent authority to "promulgate procedures best suited for their particular courtrooms as they confront the challenges presented by the global pandemic."  (*Id.* at p. 236.)

Shortly after the *Lopez* opinion, the appellate court in *Edwards*, *supra*, 76 Cal.App.5th 523, in a succinct opinion, held the trial court properly denied the defendant's motion to bar witnesses from testifying through a mask.  In upholding the trial court's ruling, the court explained:  "The trial court in this case was not trying to hide or obscure identities or the truth.  It was following national safety guidelines and court orders in response to a deadly and worldwide pandemic.  This pandemic potentially affects everyone.  The disease spreads through social contact.  This pandemic has been long and unpredictable." (*Id.* p. 527.)  Importantly, as discussed in more detail *post*, the appellate court also rejected the alterative use of clear masks or face shields.

Here, we agree with the reasoning of *Alvarez* and *Lopez*, and reject Ramirez's claims for the reasons expressed in both cases.  In view of the ongoing and persistent COVID-19 pandemic, we believe the trial court's

masking order was justified by the strong interest in safeguarding the health and safety of everyone in the courtroom. The masking order still allowed the jury to assess the reliability and credibility of the witnesses by taking into consideration such factors as their demeanor, appearance, tone of their voice, recollection, and consistency and inconsistencies in their testimony, and accordingly, did not violate the confrontation clause.

Nonetheless, Ramirez argues the trial court instead could have ordered K.E. to continue to wear the ghost mask. However, citing to the CDC recommendations, the court in *Alvarez* discounted the face shield or plexiglass screen alternatives because the CDC concluded face shields were not as effective as face masks and consequently did not recommend substituting face shields for face masks. (*Alvarez, supra*, 75 Cal.App.5th at p. 37.) The court in *Edwards* also rejected proposed alternatives to face masks—clear masks or face shields—because the defendant "offered no evidence an objective authority appraised these alternatives to be effective in combatting the disease's spread." (*Edwards, supra*, 76 Cal.App.5th at p. 527.)

Here, too, Ramirez failed to provide the trial court with any objective authority suggesting clear masks or face shields were a safe alternative to opaque masks. However, we note a slight difference in this matter as compared to *Alvarez* and *Edwards* is that the trial court indicated a willingness to allow K.E. to testify in the ghost mask if she was willing to do so. Yet, by allowing K.E. to begin to testify in the ghost mask, the trial court was able to witness firsthand the safety issues the CDC flagged in using a face shield. To wit, the trial court initially allowed K.E. to testify in the ghost mask but observed that K.E. was uncomfortable. Further, the court explicitly noted that the ghost mask was not effectively serving its protective function

27

as K.E. pulled it away from her face to testify.  Thus, the factual record here supports the conclusions reached in *Alvarez* and *Edwards* that face shields would be less effective than face masks.  Accordingly, we reach the same conclusion as many other courts that face masks covering the nose and mouth do not violate the confrontation clause.  Ramirez's Sixth Amendment rights were not violated.

IV

CUMULATIVE ERROR

Ramirez maintains that, taken together, the multiple errors constitute cumulative error that warrants reversal.  We disagree.  We found no merit to any of Ramirez's claims of error.  "A predicate to a claim of cumulative error is a finding of error."  (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)  Because we do not find any error, we also do not find any cumulative error that warrants reversal.  (*Ibid.*; see *People v. Duff* (2014) 58 Cal.4th 527, 562 ["In the absence of error, there is nothing to cumulate."].)

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.